CLARY, Administratrix, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*October 27, 1909—February 1, 1910.*

*Railroads: Negligence causing death of employee: Movement of trains, etc., in yard limits: Rules: Construction: Evidence: Ambiguity: Abrogation: Contributory negligence: Questions for jury.*

1. In an action for death caused by negligence, where the burden of proving the contributory negligence of the decedent is upon the defendant, a finding in the special verdict negativing such contributory negligence should not be changed by the trial court unless the fact is established affirmatively by undisputed evidence.
2. A rule of a railway company that within yard limits "all trains will move under perfect control . . . so as to make an accident impossible," does not impose upon the company or its employees the absolute duty of making all accidents impossible, but means (in this case at least) that the rate of speed and consequent degree of control shall be such as to prevent an accident having for its cause an excessive speed and consequent lack of control.
3. A rule that "transfer men and yard crews working within yard limits must move at a rate to insure safety," must have a similar construction.

4. The construction of a rule which in clear terms applies to all trains entering and passing through certain yard limits cannot be affected by evidence showing that it was often or commonly disregarded.

5. A rule that yard crews working within yard limits during weather that obscures the view must move "under flag protection," is ambiguous; and it is competent to show the common interpretation placed thereon by persons acting or purporting to act thereunder, or to show that if the rule required certain things it had been abrogated by common and general disregard thereof.

6. A yardmaster in charge of railway yards represents the railway company for the purpose of enforcing rules applicable to such yards, acquiescing in the abrogation of such rules, or construing them, when ambiguous, by customary action thereunder.

7. A rule requiring yard crews in obscure weather to move under flag protection, and a rule requiring all trains entering the yards to move under perfect control so as to make an accident impossible, are complementary and should be construed together.

8. An injured person cannot be held to have been guilty of contributory negligence unless (1) he acted otherwise than an ordinarily prudent person would ordinarily act under the same or similar circumstances, and (2) his acts or omissions so varying from the standard of prudence contributed proximately to cause his injury.

9. Whether or not an engineer of a switch engine, who was killed in a collision between his engine and a freight train running through yard limits on a foggy day at a high rate of speed, was guilty of contributory negligence in moving through the yard, under direction of the yardmaster, without having a flagman ahead, was in this case a question of fact for the jury.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Reversed.*

For the appellant there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondent there was a brief by *Greene, Fairchild, North & Parker,* and oral argument by *H. O. Fairchild.*

The following opinion was filed December 7, 1909:

TIMLIN, J.    After hearing the evidence in this case the jury returned a special verdict finding that the plaintiff's de-

cedent was on December 14, 1906, while in the employment of defendant as engine driver on a switch engine in the railroad yard at Marinette, killed by a collision between this switch engine and a freight train coming into said yard. The engine driver of the freight train was guilty of negligence which was the proximate cause of the death, and there was no want of ordinary care on the part of deceased which contributed proximately to cause his death. The damages to the plaintiff (his widow) were fixed at $5,000. The trial court, on motion, changed the answer of the jury to that question of the special verdict relating to the contributory negligence of the deceased so as to find the deceased guilty of contributory negligence, and then rendered judgment on the verdict so amended in favor of defendant. The only question presented upon this appeal is whether such action of the trial court was authorized upon the evidence presented. Or, in other words, whether it appeared affirmatively and from undisputed evidence that the deceased was guilty of a want of ordinary care which proximately caused or contributed to cause his death. The correct inquiry in such case, where the burden of proof is upon defendant, is not whether there is evidence to support the finding of the jury, because that may be supported by lack of evidence in whole or in part, but whether there is uncontroverted evidence which supports the ruling of the trial court in changing such an answer. Omitting the evidence bearing solely upon the negligence of the defendant, for its negligence is upon sufficient evidence established by the verdict, and consisted in running a regular freight train into Marinette and through the yard limits on a foggy day at a high rate of speed, notwithstanding the rule hereinafter quoted, we proceed to consider the evidence bearing directly or remotely upon the contributory negligence of the deceased. It seems best to consider this evidence under separate heads.

*Yards.*—Some confusion on this subject is caused by the rules and time cards, which speak of trains going from Mari-

nette towards Crivitz as trains going east, and those coming into Marinette from the direction of Crivitz as trains going west, when in fact, according to the true direction, the first-mentioned trains are going more nearly west and the last-mentioned trains more nearly east. The yard in which deceased operated his switch engine, under the orders of the yardmaster, Graham, was more than three miles long, and its termini were marked by boards or signs alongside the track bearing the words "Yard Limits." Identifying the west end of this yard, one of the rules said: "Menominee and Marinette yard limits extend to yard limit board east (west) of Park Mills siding switch east (west) of Marinette." The switch for Park Mills siding is about one and one-fourth miles from Marinette depot. Between the Marinette switch, a short distance west of Marinette depot, and Park Mills siding, there was but a single track more than a mile in length, which connected between the side tracks at Marinette and those at Park Mills and was included in the designated yard, and used for yard purposes and also by regular passenger and freight trains coming into Marinette from the west and leaving Marinette going west.

*Rules.*—It will not be necessary to consider all the rules offered in evidence and before the jury. Some of them are mere generalities, declaratory of the common-law duties of employees engaged in a hazardous service. Some relate to the duties of such employees to provide themselves with signals and familiarize themselves with the printed rules, and some have no special application to the question raised on this appeal. In that part of rule A56 relating to yard limits at Marinette occurs the following: "All trains will move under perfect control within these limits so as to make an accident impossible." It was sufficiently shown that the incoming train, which collided with the switch engine of the deceased, was a "train" within the meaning of this rule, and that it did not conform with this rule in the least, and it was also sufficiently shown that the switch engine of the deceased with its

two freight cars *en route* for Park Mills siding for the purpose of switching was not a "train" within this part of the rule. This sentence of the rule is not, however, to be taken literally, so as to cast the absolute duty of making all accidents impossible upon the defendant or its employees, but may be taken to mean, at least so far as the instant case is concerned, that the rate of speed and consequent degree of control shall be such as to prevent an injury having for its proximate cause that which is, under the circumstances in evidence, an excessive rate of speed and the consequent lack of control. So far as defendant's negligence is concerned, this is settled by the verdict. Rule A56 also contains the following:

"Transfer men and yard crews working within yard limits must move at a rate to insure safety, and during weather that obscures the view must move under flag protection."

This rule did not apply to the incoming train, but did apply to the deceased and those constituting the switching crew. The words "to insure safety" must have a similar construction to the words "to make an accident impossible," in the rule first quoted. Much evidence was received bearing upon the construction which should be given these rules and relating to the mode in which business was transacted under these rules by those who presumably knew the rules. With reference to the first-quoted rule, it was testified that this rule was often and perhaps commonly disregarded by freight and passenger trains coming into Marinette, and it was understood that such trains had a right of way as against switching engines. But while this might be evidence tending in some degree to show the abrogation of the rule by long-continued disregard or non-user with acquiescence of all immediately connected with its enforcement, the construction of that rule could not be affected by such evidence because of its clear terms including all trains entering and passing through the yard limits. Graham was a yardmaster representing the defendant in charge of the yards in question, and directed the operations of the deceased and

his associates, and had been so engaged for six and one-half years. For the purpose of enforcing rules, acquiescing in the abrogation of rules, or construing ambiguous rules by customary action thereunder, he must be held to have represented the defendant. He testified that never during the entire period of his service had he used a flag in going from Marinette siding to Park Mills siding, and being questioned whether he had ever before gone out under conditions existing at the time in question, he answered:

"Well, I can't answer that intelligently, because I might not have seen a day like that before; that is, the conditions would be different, it would be either foggier or not so foggy, and, when it was any foggier than it was that day I always ascertained where the train was. When we left that day, I could see quite a little distance. When I left that day I could see far enough so that trains approaching each other could stop."

As he now construed the rule in question, it was a violation of it to go out on the day in question without flag protection, but he did not so construe it at the time he went out with deceased. He had gone out in the same way as he did at the time in question during similar fogs, not so dense, however. The witness displayed quite an argumentative disposition and considerable intelligence and at the same time such unfamiliarity with any feasible mode of flagging ahead as might have been accounted for consistently with statements contained in some parts of his testimony to the effect that it had never been done, and that he had no experience in so doing. For example:

"Q. Suppose you were down at Marinette, and you intended to go out to Park Mills siding to do some work, and were in a fog at the starting point and sent a man out, now how far would you send him? A. Well, I would send him, if I was going to send a flag—I do not think I would send a man in the first place. Q. You wouldn't send a man in the first place? A. No. Q. Well, then, if you wouldn't do it, no

use asking you how far you would send him. *A.* Not a bit. *Q.* You would not send him out at all? *A.* If it was in a dense fog, I wouldn't send him at all. A fog that I could see I would go the way I did that day."

There is other testimony from this same witness from which a contrary inference may be derived; but on the question of the right of the court to substitute his finding for that of the jury this other evidence is quite immaterial. Doran, a locomotive engineer of thirteen years' experience at and near the yards in question, and Dwyer, a locomotive engineer of sixteen years' like experience, as witnesses for the plaintiff, gave evidence tending to show that "flag protection" in this rule did not govern the case in hand, or that, if it did, it was quite uniformly disregarded. This testimony was competent on two grounds: First, as showing what the ambiguous words "flag protection" meant by showing the common interpretation placed upon these words by persons acting or purporting to act under this rule; second, as showing or tending to show that the rule, if it did require a flagman to walk ahead of the switch engine from one side track to another through this large yard, had been with the knowledge of the yardmaster abrogated by common and general disregard thereof. The explanation of the term "moving under flag protection," attempted by counsel in the trial court and in this court, seems to us erroneous and inconsistent with the object of the rule and the idea conveyed by the word "protection." If a moving locomotive in obscure or foggy weather sends a flagman ahead, the locomotive then waiting, after the flagman disappears in the fog ahead, there is no way in which the locomotive he has left can be informed whether he has or has not, before he reached the switch, encountered another train on the track. In case this flagman is to go ahead only a fixed distance, and then wait for the engine he has left to come up and overtake him, whereupon the engine stops and he advances another fixed distance and again waits until the engine reaches him, there is no protection

at all against a train coming as this freight was, at or near the relay points. On the other hand, if the flagman precedes the engine, the latter following him at a distance but keeping in sight, and if we assume that a flagman in a fog is as visible as an oncoming train (which is quite a violent assumption), then the presence of the flagman will exactly double the distance in which the trains will know of one another's approach, but this distance will be variable, depending upon the density of the fog; that is, if the one train can see the flagman 300 feet ahead and the other train also sees him 300 feet ahead of it, there will be 600 feet between the engines at the moment when each may be signaled regarding the presence of the other. This does not seem very adequate for protection. But enough has been said to show that the rule relating to movements of switch engines in the yards in obscure weather is quite ambiguous, and it is doubtful whether the counsel or the court, after all the investigation of this trial, now understands its application to all phases of yard work, and it is very clear that the yard-master of the defendant does not understand it. Whether we consider moving under flag protection to mean requiring the preceding flag bearer to go ahead and out of sight of the engine following the whole distance to be covered, or to mean to make this distance by relays whether going out of sight or not at each relay, or whether we consider it to mean to go ahead of the engine, the latter following at the same rate of movement and at such distance as to keep the flagman in view, it must be apparent that the rule requiring the other train moving in the opposite direction to move slowly and under complete control is the necessary complement of the rule relating to the movements of the switch engines. One is a senseless and ineffective ceremony without the observance of the other. They relate to reciprocal duties and obligations concerning the same transaction; and here the reasoning of the learned circuit judge seems to be at fault in attempting to consider these rules separately and independently. They can no more be sepa-

rated for the purpose of construction than can statutes *in pari materia* or mutually dependent covenants in a contract.

*Fog.*—There was evidence in the case from which a jury might infer that when the switch engine left the station at Marinette, the fog, then in view, was not so dense as to require an ordinarily prudent person to make any change in the former mode of transacting the business of switching. They might believe that, because Graham did not think the fog was of such density as to create the obscurity mentioned in the rule, the deceased might have been of like mind and have like understanding of this rule. This was at least an item of evidence bearing upon the inquiry of ordinary care. The fog was more dense farther on, and down towards the bridge was so dense that one could not see a train approaching further than 200 to 300 feet, and Mr. Graham, watching carefully, did not see the incoming freight train until it was about 200 feet from the switch engine. Graham's figures relating to increasing intensity of fog are that about half way out to Park Mills one could see an approaching train through the fog 800 feet; farther on and near the bridge, 400 to 500 feet; farther on, and from the bridge to the place of accident, 200 to 300 feet.

*Negligence of deceased under the foregoing conditions as to yards, rules, and fog.*—The regular freight train No. 465, coming in from the west, was due at Marinette at 12:50 p. m. The evidence fails to show with any certainty whether one coming up to the station at Marinette several minutes later could notice whether this train had arrived or not. Graham was charged with the duty of ascertaining this fact, and he knew that freight No. 465 was overdue and had not arrived, when, with the deceased and other members of the switching crew, he came, on the switch engine with two cars attached, bound for Park Mills siding, at 12:57 p. m. to the Marinette depot. The switch engine carrying Graham, the deceased, and the switchmen slowed up as usual in passing the Mari-

nette depot. Graham glanced in and saw that the telegraph
operator was not there, and, thinking the latter at dinner,
made no inquiry with reference to the whereabouts of freight
No. 465, but moved on out in the direction of Park Mills, from
which direction freight No. 465 was then seven minutes over-
due. Whether deceased at this time knew that freight No.
465 had not arrived is not satisfactorily shown. His knowl-
edge of that fact is only to be inferred from two bits of evi-
dence: First, that he had a time-table and knew when these
regular trains were due at Marinette; second, that on the way
out a conversation occurred between Graham and deceased at
a point about one third of a mile from where the accident hap-
pened and where the fog was so dense that they could see only
about 500 feet ahead. This conversation is not always given
by Graham consistently, but, selecting a phase which the jury
might have believed, it appears that Graham said to the de-
ceased: "We are going a little too fast. We had better slow
down." The deceased applied the air brake, slowing down
from fifteen miles to about six miles an hour. Graham re-
marked, "We must run slower and look out for No. 465," and
the deceased answered, "They ought to have sense enough to
come in slow a day like this." Proceeding from this point
slowly, Graham soon heard freight No. 465 whistle some dis-
tance ahead of the switch engine, and at once notified deceased,
who proceeded to stop his engine, reverse its movement, and
run backward with all possible dispatch. Graham, intently
watching for the oncoming freight, saw it appear out of the
fog, far within the yard limits, and coming at the rate of
twenty-five to thirty miles an hour, and about 200 feet ahead
of the switch engine. Graham jumped from the switch en-
gine while deceased was in the act of stopping and reversing.
The engineer and fireman of freight No. 465 jumped from
their engine. The deceased continued in his engine, and had
succeeded not only in bringing it to a stop, but also getting
it in motion backing away from the oncoming freight, and
had made some 120 feet backward when the collision took

place which produced death. Upon this showing can we say that the uncontroverted evidence shows the deceased guilty of a want of ordinary care which contributed to cause his death? The question of contributory negligence covers two propositions: First. Did the person whose conduct is under investigation act otherwise than an ordinarily prudent person would ordinarily act under the same or similar circumstances? Second. If this point is resolved in the affirmative, did his acts or omissions so varying from this standard of prudence contribute proximately to cause his injury? With reference to the first, there was evidence from which the jury might infer that the deceased was as careful at least as Graham, and that both were as careful as was usual and customary in the conduct of like operations in this particular yard. So far as the interpretation of the rule relating to switch engines was concerned, the practice for years, and the evident understanding of this rule by his superior, Graham, is entitled to some probative weight. Who will say that an ordinarily prudent person would refuse to acquiesce in this interpretation of the rule in question and refuse to proceed, or, having proceeded to within one third of a mile from the point of collision, would take the command out of Graham's hands when the fog was growing thicker and himself send a flagman ahead? After the whistle of No. 465 was heard, everything was done which could be done. Graham then after jumping ordered a flagman ahead, but it was too late. If deceased showed any lack of ordinary care it must have been in starting out from the depot at Marinette or in failing to stop the engine and send a flagman ahead at the point at which it became manifest that the fog was of sufficient density to require this precaution. With reference to the first point, there is evidence of Graham tending to show that the fog there visible was not of such density as to require unusual or extraordinary care. With reference to the second point, there is evidence tending to show that the deceased might have relied on the superior knowledge or higher authority of Graham. But the second

branch of the inquiry is beset with still greater difficulties in the way of supporting the ruling of the court below. Would a flagman ahead have been in the least effective to prevent a collision of the switch engine with train No. 465, the latter moving at thirty miles an hour and the fog so dense that the freight train remained invisible until within 200 feet of the switch engine? Assuming that rule A56 relating to switching engines was never abrogated by acquiescence and disregard of it, and that it required each and every member of the switching crew to conform to it, notwithstanding their superior understood the rule differently, is it not a question of fact whether the sending of a flagman ahead in the only feasible way would have prevented the injury; and consequently whether the omission so to do was at all a proximate cause of the injury? The rule requiring the sending of a flagman ahead of the switch engine, if it is to be so interpreted as to apply in the instant case, is for protection against and for another engine approaching from the front under such control as the reciprocal rule governing the movements of the other train requires. In a dense fog a flagman 200 feet ahead of the switch engine would be entirely ineffective to protect against an incoming train moving at thirty miles per hour. To send him farther ahead would be to require both the engines to come to a stop for an indefinite time on the main line at the risk of the other trains. Giving this rule the former interpretation, it was a question for the jury whether the failure to send a flagman 200 feet ahead was a proximate cause of the plaintiff's death. We are of opinion that the circuit court erred in deciding that the plaintiff was guilty of contributory negligence, and consider that question one of fact for the jury. Hence the answer of the jury must be reinstated and judgment given for the plaintiff on the verdict.

*By the Court.*—It is so ordered.

A motion for a rehearing was denied February 1, 1910.