POWALSKE, by guardian *ad litem*, Appellant, vs. CREAM CITY
BRICK COMPANY, Respondent.

*April 30 — May 21, 1901.*

*Master and servant: Personal injuries: Unguarded machinery: Stat-
utes: Nonsuit.*

1. Sec. 1636j, Stats. 1898 (providing, among other things, that the owner
   or manager of every place where persons are employed to perform
   labor shall securely guard or fence all shafting which is so located
   as to be dangerous to employees in the discharge of their duty),
   plainly contemplates that the persons mentioned shall exercise
   ordinary judgment in determining whether machinery should be
   guarded, and that, in such exercise, they shall bring to bear upon
   the subject ordinary prudence under the circumstances of each
   particular case.

2. Where shafting is so located that an employee must necessarily go
   out of his ordinary course, or any course which he might reason-
   ably be expected to take, in order to reach it, ordinary care and
   prudence on the part of the master does not require it to be guarded.

3. The question whether a shaft is dangerous in an unguarded condi-
   tion, within the meaning of sec. 1636j, is not to be determined or
   necessarily influenced by the mere fact that an employee was in-
   jured thereby.

APPEAL from a judgment of the superior court of Milwau-
kee county: ORREN T. WILLIAMS, Judge. *Affirmed.*

At the time of and for a considerable period before the
occurrence complained of, defendant was a manufacturer of
brick and plaintiff was one of its employees. A part of the
brickmaking plant consisted of a building, in which was lo-
cated, near the north end, a machine called a "crusher,"
through which the clay was put before being made up into
brick. The clay was conveyed to the crusher in this way:
In the north end of the building was an opening five feet
square, the lower side of which was at the surface of the
ground. The clay bank was about 200 feet north of such
opening, and a roadway led from one to the other. Two

one-horse dump carts were used, attended by a boy. There was a horse for each cart. The boy would locate one of the carts at the clay bank, and when it was loaded drive it to the opening, there discharge the load, and then return to the clay bank, take the other horse and repeat the operation, and so continue the work during the day. He was required to be very active in order to keep the crusher supplied with clay. As he approached the vicinity of the opening with his horse and dump cart, he would turn halfway around and back the cart up so that the tail end thereof would be inside the opening. He would then descend from the cart on the west side thereof, and release the cart box so as to admit of its being tipped up. He would then go to the back end of the cart and take out the tail board or receive it from the man inside the building. If the cart box did not then readily tip up so as to dump the clay or permit of its being removed from the box readily by the man inside the building, the boy would go to the front end of the cart and lift on the box sufficiently to tip it up. The lower side of the wheels of the cart, when it was in position at the opening, were below the surface of the ground outside the cart track. On the west side of the cart and along the line where the boy was required to travel in going to the opening to remove the tail board or receive it as before indicated, was an accumulation of small stones and other rubbish. Such accumulation was from one and one-half to two feet deep in the pathway and sloped upward to the west to a height of four or five feet. The stones, of which the refuse was mainly composed, had been picked out of the clay by the man inside the building and thrown through the opening. The form of the stone pile was such that there was a tendency of the stones to roll down into the pathway. The stones were slippery from the damp clay, so that as the boy walked over them he was in danger of slipping and falling. About three feet west of the opening

and one foot above the level thereof, the driving shaft, from which was belted the machinery inside the building, protruded through the end of the building about two feet. Such shaft was about two and one-half inches in diameter. It revolved very rapidly when driving the machinery. It was put up in the manner indicated for convenience in repairing it in case of a breaking thereof, the idea being that the fractured end could be cut off and the shaft moved south without taking it out of its bearings. As the boy walked by the west wheel of the cart to remove or receive the tail board as indicated, the west side of his body approached to within about eighteen inches of the revolving shaft, which was at that point about opposite his breast. He had no occasion to move nearer to the shaft than that in the course of his work, and no occasion to use his hands in that direction unless to save himself in case of slipping on the stones.

Plaintiff, a lad fifteen and one-half years of age, was, on September 19, 1897, in charge of the delivery carts. He was a boy of moderate intelligence, having attended school considerably, though he was a dull scholar, and was a boy of considerable experience as a laborer. Previous to the day in question he had been employed about the brick-yard in various capacities suitable for one of his age, the last being that of driving a team to deliver brick to customers. On the morning of the day named, for the first time, he was set to work with the delivery carts. He was obliged to leave his horse occasionally, after placing the cart in position at the opening, to do other work. One of the horses was troublesome at such times, in that he would not stand quietly, but would go forward and otherwise move about. To obviate that difficulty plaintiff requested the foreman to give him a rope, and was thereupon directed to procure one that was on a shelf just inside the opening. He used the rope by tying one end to the ring of the bridle bit and the

other to a stone after placing his horse in position for the clay to be unloaded. During the noon hour, to facilitate the operation of tying the horse, plaintiff made a hook out of a piece of wire and tied one end of the rope to that, and took an old tin pail, filled it with stones, tied a canvas over the top, and tied the other end of the rope to the bail thereof. Thereafter, when he placed his horse in position for clay to be unloaded, he would engage the hook with the ring of the bridle bit. The foreman observed the way plaintiff was using the rope. About four o'clock in the afternoon, the man inside the building complained that clay was not coming fast enough, whereupon plaintiff resolved to give his undivided attention to that business, which rendered further use of the rope unnecessary. Thereupon he removed the rope from the pail and proceeded with it, on the west side of the horse and cart, to the opening, for the purpose of replacing it on the shelf from which he obtained it. As he proceeded he was engaged in winding the rope in a coil around his wrist. As he arrived at the opening he caught the rope sufficiently near the loose end to enable him by a single movement to place it on the shelf, at which instant he made an involuntary movement in some way, whereby the end of the rope was thrown up and carried by the wind, which was blowing briskly, west against the shaft, which instantly caught it and wound it up so rapidly that he was unable to disengage his arm therefrom. The result was that he was drawn to the shaft and revolved around the same and severely injured. This action was brought to recover compensation for such injury. The breaches of duty on the part of defendant, complained of, were failure to warn plaintiff of the danger to be apprehended from the shaft, failure to furnish him with a suitable rope for tying the horse,— the one furnished him being frayed at the end so as to be liable to be carried about by the wind,— and failure to box the end of the shaft. The evidence tended to establish,

or established without controversy, the facts detailed. At
the close of the evidence the court granted a nonsuit, and
plaintiff appealed.

For the appellant there was a brief signed by *H. K. Cur-
tis* and *Sam'l Rosendale,* attorneys, and *Sam'l Rosendale,* of
counsel, and oral argument by *Mr. Rosendale.*

For the respondent there was a brief by *Van Dyke & Van
Dyke & Carter,* and oral argument by *W. E. Carter.*

MARSHALL, J.   Though the complaint charges respondent
with three distinct breaches of duty, it is not claimed that
any was established by the evidence except that involved
in the question of whether the unguarded shaft was so lo-
cated as to be dangerous to appellant in the performance of
his duty as one of the respondent's employees.   Sec. 1636j,
Stats. 1898, provides that, " The owner or manager of every
place where persons are employed to perform labor shall se-
curely guard or fence all  .  .  .  shafting  .  .  .  which is so
located as to be dangerous to employees in the discharge of
their duty."   Now, if it would not be reasonable to say, on
the facts of this case, that the shafting in question was so
located that respondent, in the exercise of that care for the
safety of its employees which is contemplated by the statute,
ought to have apprehended that it might probably cause a
personal injury to some one of them, appellant's case failed
at the very outset.   The statute does not require every shaft
in a factory to be guarded or fenced, but only such as are
so located as to be dangerous to employees in the discharge
of their duties.   It does not hold the owner of a factory,
where machinery of the kind it mentions is used, bound to
anticipate every possible danger to his employees that may
in any event exist therefrom by reason of its being un-
guarded.   The statute must have a reasonable, sensible con-
struction.   It plainly contemplates that persons required to
comply with its provisions shall exercise ordinary judgment

Powalske vs. Cream City Brick Co.

in determining whether machinery should be guarded, and that, in such exercise, they shall bring to bear upon the subject ordinary prudence and intelligence under the circumstances of each particular case. So, whether the shaft in question was dangerous in its unguarded condition, within the meaning of the statute, is not to be determined or necessarily influenced by the mere fact that appellant was injured thereby. If it had been located several feet above appellant's head as he was about his work, it would still have been possible for him to have been injured by it in many ways that might be imagined. The question is, Would a person of ordinary intelligence and prudence, circumstanced as defendant's officers or those having charge of its business were, have apprehended that the unguarded shaft might probably cause a personal injury to some employee while in the discharge of his duties? If not, then the failure to guard it was not a breach of duty to appellant; and if the circumstances of the case upon which the conclusion must turn were, upon the evidence, so clearly in favor of respondent as not to reasonably admit of a finding to the contrary, manifestly it was free from the charge of actionable negligence upon which appellant contends the case should have been submitted to the jury, and the nonsuit was properly granted.

It is said that the question of whether the shaft should have been guarded was for the jury. Expressions to that effect may readily be found in legal opinions, but the authors thereof anticipated that they would be read in the light of settled principles of law. This language was used in *Guinard v. Knapp-Stout & Co. Company*, 95 Wis. 482. "Whether the statute requires such machinery to be covered or guarded depends upon whether it is 'so located as to be dangerous to employees when engaged in their ordinary duties.' . . . That is a question of fact for the jury." Manifestly, the court was speaking with reference to the evidence in that

case. As a general proposition, such a question is to be solved in the same way as any other question of fact. In this case, if the evidence showed that the unguarded shaft was so located as to be dangerous to employees in the discharge of their duties, with such clearness that reasonable minds could not reasonably differ in respect thereto, it was for the court to solve the question at issue as one of law, and the same is true if the unguarded shaft was shown to have been so located as not to be dangerous to employees while in the discharge of their duties, with such clearness that reasonable minds could not reasonably differ in regard thereto. It is the duty of the court, where such a question is presented, upon motion therefor, to decide whether there are conflicting reasonable inferences from the evidence as to where the truth lies, and, upon a decision in the affirmative, to send the case to the jury to decide which is the proper inference to be drawn. The court has no right to refuse to judicially determine the first question suggested, and no right to go further and invade the province of the jury by passing upon the second question mentioned. Here the court decided that there was no room in the evidence to reasonably decide but one way, as to whether the statute required the shaft to be guarded; and that decision, and the result of it, must be sustained unless we can say that it is clearly wrong. *Powell v. Ashland I. & S. Co.* 98 Wis. 35; *Dewey v. C., M. & St. P. R. Co.* 99 Wis. 457; *Maanum v. Madison,* 104 Wis. 272.

It seems to us, the rule applies to the facts of this case, that, where a danger is so located that a person must necessarily go out of his ordinary course, or any course which he might be reasonably expected to take, in order to reach it, ordinary care and prudence on the part of another, who is in duty bound to guard him from personal injury within the scope of the risk to be reasonably apprehended therefrom, does not require it to be guarded against. *Gorr v. Mittlestaedt,*

96 Wis. 296. That rule is most often applied in highway cases, but the principle involved reaches every case where duty on the part of one person to guard the personal safety of another is restricted to such dangers as such other is reasonably liable to come in contact with in the ordinary course of events, within particular limits. In *Hadley v. Taylor*, L. R. 1 C. P. 53, Mr. Justice WILDE stated the rule as to highways in substance thus: Whether a dangerous place near a highway renders it unsafe for public travel depends upon whether a person may be injured thereby from an accident happening on such highway, or whether he must wander from the way to reach such danger.

Now it is clear that appellant's employment did not bring him within the region of danger from the unguarded shaft. The nearest that any one could reasonably have expected his person, as he moved about his work, would probably come to the shaft, was about eighteen inches, at which point it was west of and about on a level with his breast. When he was so located, a movement directly towards the shaft was quite well guarded against by the large pile of stones under it, which sloped from the pathway along the west side of the cart upward and westward to the height of some four feet. The only way he could reach the shaft was by stepping out of the path and up on the pile of stones. There was no occasion whatever for him to do that. The form of the stone pile and the character of the stones were such that to advance towards the shaft was a somewhat difficult feat. If we admit that the danger of slipping on the stones that were in the pathway, and falling, should be considered, then it seems plain that the location of the shaft was such that the danger of a person, circumstanced as appellant was about his work, reaching the shaft in that way, was so remote as to be regarded as only within bare possibilities,—not an event within reasonable probabilities. In case of one so circumstanced slipping and falling, his course would be down-

ward, and if, in any event, it were also sideways towards the shaft, there would be no danger reasonably to be apprehended of his coming in contact with it. He would fall against the sloping side of the stone pile without reaching the shaft. We are unable to imagine any movement that it could reasonably have been apprehended appellant might probably make in the course of the ordinary discharge of his duty, that would bring him in contact with the shaft or within the region of danger therefrom. The connection was made, between him and the danger which caused the injury, by means of the rope that he, in some way, swung around so that the end of it was caught by the shaft. Just how that was done does not satisfactorily appear. It does not even appear so that any one could say, from the evidence, with reasonable certainty, how it probably occurred. Appellant was not able to explain it with any reasonable degree of definiteness. It is sufficient for the purposes of this case, however, that it clearly appears from the evidence that in the ordinary course of events appellant could not reasonably have been expected to be in danger of in any way coming in contact with the unguarded shaft. It necessarily follows that it was not required to be guarded, and the nonsuit was properly granted.

*By the Court.*— The judgment is affirmed.