Houg, Respondent, vs. Girard Lumber Company, Appellant.

*October 25, 1910—January 10, 1911.*

*Appeal: Review: Questions of fact: Master and servant: Injury from unguarded machinery: Contributory negligence: Sufficiency of evidence.*

1. While the verdict of a jury should not be disturbed on appeal as being contrary to the evidence if there is any evidence which, in any reasonable view, will sustain it, and the decision of the trial court denying a motion to set it aside should not be over-ruled unless clearly wrong, nevertheless, physical situations and impossibilities sometimes controvert the testimony of witnesses given upon the stand and must be given controlling weight.

2. Neither the statute relating to the guarding of machinery so located as to be dangerous to employees in the discharge of their duties, nor the common-law rule on the subject, applies to a situation where, in order to come in contact with such dangerous machinery, the employee must necessarily go out of the usual way and out of any way which he would reasonably be expected to take.

3. An employee in a sawmill was injured by having his foot caught between a sprocket wheel and a chain. One of his duties was to oil certain machinery about eleven feet above the floor. He had performed this duty safely for a considerable time in the usual way, ascending, as he had been instructed, by a stairway to a platform near the machinery. In so doing he did not come near the sprocket wheel. Before the accident, however, he had adopted a new way, ascending by a ladder on the other side of the machinery to a plank laid upon timbers. At the time in question he had stepped from the plank over the moving chain and then back again, in a stooping posture, to a slender foothold on a timber just below the chain, and was attempting, without returning to the plank or to the floor, to reach other machinery by moving along another timber close to the chain and the wheel and covered with frozen sawdust. He knew all the conditions surrounding him. His foot slipped and was drawn in between the chain and the sprocket wheel. *Held*, as a matter of law, that he was guilty of contributory negligence.

4. In such case it was no excuse for the injured employee that in going up the stairway he would have to pass close to a broken sawdust spout from which sawdust and other materials were

being ejected, where such break was easily repaired and he had been accustomed to make similar repairs in the past.

5. The defect complained of being an unguarded set-screw projecting from a collar on the shaft of the sprocket wheel a few inches away from the wheel, and plaintiff's own testimony showing that his foot was drawn in between the chain and the wheel until the wheel stopped because of the obstruction, testimony to the effect that the set-screw continued to revolve and cut into the flesh of his foot was incredible, and a finding by the jury that the injury was caused by such set-screw was unsupported by the evidence.

6. No amount of conjecture or weight of mere possibility can support a verdict in plaintiff's favor in an action for personal injury, but reasonable certainty as to the cause of the injury must be established to warrant a recovery.

· KERWIN, SIEBECKER, and TIMLIN, JJ., dissent.

APPEAL from a judgment of the circuit court for Marinette county: SAMUEL D. HASTINGS, Circuit Judge.    *Reversed.*

Action to recover for a personal injury.    Plaintiff pleaded that, while in the due performance of his duty as an employee of defendant, he was severely injured in his right foot by reason of its being caught by a revolving shaft, armed with a sprocket wheel, collar, and projecting set-screw, so located as to be dangerous to employees in discharge of their duties, unless securely guarded, and that no guard whatever was provided.

All material allegations respecting the circumstances of the injury were put in issue by answer.

On the evidence the main controversy was as to whether the injury occurred by reason of plaintiff's foot having come in contact with the unguarded set-screw or it being carried by the sprocket chain against the sprocket wheel and caught between them; whether such set-screw was so located as to be dangerous, unless securely guarded or fenced, to employees in the discharge of their duties; and whether plaintiff was guilty of fatal contributory negligence.

The evidence was to this effect: Plaintiff was forty-two years of age.    He had worked in and around the sawmill

where he was injured for years and was familiar with all parts of it, particularly the part where the accident occurred. He had been oiler for some months before he received the injury and had been many times in the place where he made the fatal movement. The particular work preceding such accident was oiling journals at the tightener frame. In doing this he had to ascend from the basement floor of the mill about eleven feet. The usual way was from the south side of the frames by a pair of stairs. Then there was a platform to step out upon, which reached nearly to the frame. In going that way one did not approach the region of the sprocket wheel. There were no interferences except what was caused, from time to time, by escape of sawdust and pieces of wood from a break in the east sawdust spout. Such a break happened from time to time, but was easily repaired by nailing on two or three small pieces of boards. It was but the operation of a few moments to do that. It was not particularly plaintiff's business to repair such breaks, but he was allowed to do it, as he saw fit, and on occasions did do it. Whenever repairs were needed the fact came specially to his attention, and he was particularly interested in the matter, unless he chose to approach the tighteners from the north side. Some pieces of boards were off the side of the sawdust spout at this time. He gave as a reason for not replacing them, that he did not think of it, and said, in effect, that he chose to do his work by going up on the north side of the frames, though had it not been for the interferences coming from the hole in the sawdust spout he would have gone up on the other side. For a long time before he commenced doing the oiling, the only way in use of approach to the frames was from the south side. He was instructed in that regard. He used that way for a considerable length of time and then discovered and adopted the way he was using immediately before the injury.

The situation was this: There were two tightener frames in the basement story of the mill hung from the floor above and

reaching down several feet. They were in a line east and west and about five feet apart. A little north thereof, parallel therewith, and a little below them there was an eight-inch square timber. Projecting directly down from the main floor, just north of the timber and a little west of a line drawn at right angles with the west side of the east tightener frame, there was a sawdust spout. East of the west tightener frame there was a similar spout. About midway between the two spouts on the eight-inch square timber the journal box of the sprocket wheel was located. It was eight inches long with and reached nearly across the timber, was about five inches high, and had an oil cup in the top. Plaintiff was accustomed to oil at that point about once a week. The sprocket wheel was slow moving, the revolutions being about twenty-four per minute. The journal did not need oiling on the occasion in question. Plaintiff did not approach it for that purpose. The shaft was two inches in diameter, was short, and ran north and south. It projected through the box to the north, somewhat. On the inner side of the box there was a two-inch-wide collar kept in place close to the inner end of the box by a set-screw projecting outward to within about two inches of the rim of the wheel. There was a little space between the inner edge of the timber and the south end of the box, which was cut out, thus making room for the collar to operate. It was inclosed, largely, in the south side of the timber. The sprocket wheel was fastened to the shaft about one and one-half inches from the collar, so the wheel was about three and one-half inches from the box, but only about two or two and one-half inches from the timber. It was seven or eight inches in diameter and one and one-half inches wide at the rim. It carried a sprocket chain made of links about three inches long and two inches wide. The projections on the wheel were about one and one-half inches long. They extended beyond the outer side of the links, as the latter engaged the wheel, and were rounded on the ends. The sprocket chain

ran at an angle somewhat upward from the plane of the tim-
ber and to the east, so that at a point opposite the east tight-
ener frame, the lower chain was a little above the lower cross-
timber thereof, and the upper chain, by reason of weight and
slack, was practically on the lower one. The power was ex-
erted on the latter which moved to the right, passing under the
sprocket wheel a little below the level of the top of the timber.
A ladder was provided for ascending to the place for oiling
the journal, which was some eleven feet from the basement
floor. Plaintiff in order to construct for himself a way of
reaching the tightener frames and journal box, placed, se-
curely, a plank of sufficient width to enable him to walk on it,
in a somewhat stooping position, on account of the floor above,
about fourteen inches north of the timber and on a level there-
with. This plank spanned the space north of both tightener
frames and the journal box, and was near enough thereto so
that plaintiff, when standing upon it in front of either, could
reach and grasp the side of the frame with his left hand, and,
holding his oil can in the right, step, and partially raise him-
self to a standing position, on the lower cross-piece of the
frame, in which position he would do the oiling. In the par-
ticular instance he placed his ladder against the timber at the
east end of the plank. He then ascended to and stepped onto
the plank and walked west to a point north of the east tightener
frame. The sprocket chain was in operation. He passed
his left foot over the chain to the lower cross-piece of the
frame, taking a pretty long step in doing so, southward and
upward. Grasping the east side of the tightener frame with
the left hand he raised up so as to stand on the cross-piece,
resting his whole weight on the left foot. He then put his
left arm around the east side of the tightener frame, and there
stood with his right foot backward and outward—the limb
being outside of and near the moving sprocket chain—and did
the oiling. That over, he endeavored to retreat by first plac-
ing his right foot on the timber just outside of and a little

lower down than the chain. That not being feasible, as he thought, because of a frozen accumulation of sawdust on the timber, he passed his foot under the sprocket chain sufficiently to locate the toe thereof securely on the cross-timber of the tightener frame. Then he lifted the left foot over the chain and gave it a location similar to that of the right foot. Thus he secured himself in place with the toes of his shoes resting on the tightener frame and the sprocket chain in motion a few inches above his feet and just in front of his lower limbs, maintaining his equilibrium by leaning slightly forward and keeping a secure hold on the tightener frame. The next duty he had in mind to do was to oil the journals at the west tightener frame, located, as indicated, on the other side of the sprocket wheel. He could as readily have stepped back to the plank as he stepped from it, and proceeded to and down the ladder and then moved that west to the vicinity of the other tightener and thereby reached it without going near the sprocket wheel. That was the way he had ordinarily performed the work since he had chosen to approach the tighteners from the north, instead of the south side. As he stood in the position aforesaid, there was a floor timber at his back which came down sufficiently to render it necessary for one, in reaching a tightener frame from the plank or the plank from a tightener frame, to bend down somewhat. He knew all the conditions surrounding him, particularly the fact that frozen sawdust was irregularly located on top of the timber near the sprocket wheel journal. He concluded not to return to the floor and reach the west tightener frame by means of the ladder, but to go along the plank, passing by the end of the sprocket wheel shaft, or along the timber and over the sprocket wheel box. Instead of stepping to the plank as he had stepped from it, he supported himself on the right by placing his hand or arm on the side of the sawdust spout, then—with his left hand grasping or left arm placed around the west side of the tightener frame, and so maintaining a substantially upright

position—he reached his right foot quite a good step outward and around the sawdust spout, for the purpose of locating it on the timber between the spout and the bearing of the sprocket wheel shaft. In doing so his foot encountered the uneven surface at the top of the timber, slipped inward, on top of the lower sprocket chain, and was quickly carried west to and caught between the chain and wheel and severely injured. When his foot, or some part of its covering at least, was carried between the wheel and chain, it stopped the machinery. Motion was transmitted to the sprocket wheel shaft by a friction, allowing the interference of plaintiff's foot, as aforesaid, to overcome the contact and bring the sprocket wheel to a stop. It was so located that no employee in the discharge of his duties was liable to get in dangerous proximity thereto, as the work had been done prior to plaintiff's choice of the particular way described.

There was some conflict in the evidence from the mouths of witnesses as to whether plaintiff's foot came into contact with the set-screw. Here is the evidence of plaintiff, substantially: The shaft was turning at a slow rate, about thirty revolutions per minute. The under chain was in motion toward the sprocket wheel. In trying to place my foot on the timber it slipped in on top of the chain and was caught between it and the sprocket wheel. The foot was dragged in between the chain and the wheel till the wheel stopped against the inside of my foot, and then the set-screw commenced to work, gouging piece by piece. The set-screw dug into my foot on the top and side down to the toes as it went around and around. The chain drew my foot right into the sprocket wheel. That stopped the wheel from running. Otherwise it would have wound my leg around the wheel. Everything stopped and that was the position I was found in. They had to take the top off the box and pry up the shaft to get me out. I then got out by crowding my foot down between the timber and the sprocket wheel.

That was the way plaintiff left the case at first. Then he testified about like this: My foot was in on top of the bottom chain and was drawn under and against the set-screw. The big toe and toe of my rubber went under the sprocket wheel. The wheel revolved some time after my foot was caught. My foot was caught on the right side in the sprocket wheel. My foot slipped right ahead. The wheel caught my leg and dragged my foot in. My big toe was not hurt. My foot stopped the sprocket wheel when it got in tight enough. The wheel went clear around after my foot was caught. It did not have power to drag my foot clear around and break my leg, so when my foot was dragged in the wheel stopped. The wheel did not go around after the shaft stopped. It was going around when it dragged my foot in close. It went around several times. It did not have power enough to carry my leg under so the wheel stopped.

Again the matter was taken up and plaintiff gave about this: I do not think my big toe came under the sprocket wheel. There was room for the toe of my rubber to be caught without catching my toe. I was too scared and excited to know just how it was, but my foot was held there in some way.

Axel Peterson, who helped release the plaintiff, testified that the latter's foot was not caught in the sprocket wheel at all; that his foot was fast under the collar, and that the set-screw pointed up; that the top of the box was not taken off in order to release him; but that they sprung the shaft a little with a handspike, "sprung her—gave it a little slack" and then worked plaintiff's foot out without turning the wheel back.

The doctor, who testified in plaintiff's behalf, described the injury as a lacerated wound on top and across the instep. He said there was no injury to the toes or the foot other than the wound across the top where the tissue had been torn away with probably some injury to the bones; that adhesions had formed binding the three bones connecting the three middle toe joints with their instep bones together and causing con-

tractions of the tendons of such toes so as to draw them upward.

The cause was submitted to the jury, resulting in a verdict substantially as follows: There was an unguarded set-screw in the collar on the sprocket wheel shaft. It was so located as to be dangerous to employees of the defendant in the discharge of their duties. Plaintiff's foot was injured by the set-screw. No want of ordinary care on his part contributed to the injury. It will take $4,651 to compensate him for his injury.

Judgment was rendered for plaintiff on the verdict.

For the appellant there was a brief by *Eastman & Martineau*, and oral argument by *E. C. Eastman*.

For the respondent there was a brief by *Martin, Martin & Martin*, and oral argument by *P. H. Martin*.

MARSHALL, J. The judgment must be reversed for three reasons. Each involves the sufficiency of the evidence to support some vital part of the verdict. In condemning the result as to each such feature, we keep in mind that this court should not disturb the verdict of a jury as contrary to the evidence, if there is any evidence, which, in any reasonable view, will sustain it; and also appreciating the force which should be given to this other rule: in case a trial court on motion to set aside a verdict as contrary to the evidence approves it, his judgment should not be overruled unless clearly wrong. But in reaching our conclusion we have also to appreciate that the manner of an occurrence as testified to from the mouths of witnesses is not necessarily to be taken as matter of fact even if not in like manner contradicted. Sometimes physical situations and impossibilities speak much more weightily than the vocal utterances of any witness, or number of witnesses. The former cannot falsify. The latter can and often do. The one is indisputable. The other never is.

The jury found that the shaft with the unguarded set-screw was so located as to be dangerous to employees of the defend-

ant in the discharge of their duties. Why so? It was entirely out of reach of any of the employees in the discharge of their duties. It will be seen by the statement that the way of reaching it was by ascending eleven feet from the basement floor. There was no occasion for going near it except to oil ·the bearing of the sprocket wheel shaft. In that, there was no occasion for any part of an employee's person or clothing coming in contact with the shaft where it was armed with the set-screw. Really, it was not possible to do·so without actually invading the region some six inches beyond the oil cup on the journal box, which no·one, it seems, could reasonably be expected to do. An operator had, actually, to go outside any course which any one would reasonably be expected to take, as respondent in fact did, in order to reach the uncovered set-screw. The evidence leaves no doubt but what no one would have supposed an employee would attempt what respondent did,—climb around on the narrow timber supporting the end of the sprocket wheel shaft, cling by one hand-hold and one foot-hold to the tightener frame, with his person hanging, as it were, out over the sprocket chain; then climb down over the chain, placing the feet on the cross-piece of the tightener frame, the rapidly moving chain coming just over the top of the feet, making it necessary to keep hold of some support with both hands to avoid danger of severe injury; then work along by the aid of hand-holds, in an endeavor to pass around the sawdust spout and get a footing on the uneven surface of the timber in the vicinity of the uncovered set-screw, or gain such footing as a prelude to stepping back to the plank with the idea of groping along it by the end of the sprocket wheel shaft to the other tightener frame. If there be anything in the evidence suggesting, reasonably, that appellant was chargeable with knowledge of any likelihood that an employee would do so, or get into dangerous proximity to the set-screw, we are unable to find it. He got there, as said before, by going out of the ordinary way, choosing to do his work in a different

way from the customary one; a way which he discovered and arranged to suit himself.

The case is ruled, as counsel for appellant contend, by the doctrine that the statute and the common-law rule as well, respecting the guarding of machinery so located as to be dangerous to employees in the discharge of their duties, do not apply to a situation where the employee must, necessarily, go out of any way which he would be reasonably expected to take in order to reach it. *Powalske v. Cream City B. Co.* 110 Wis. 461, 86 N. W. 153; *Miller v. Kimberly & Clark Co.* 137 Wis. 138, 118 N. W. 536.

The foregoing, while condemning the finding of negligence in not guarding the set-screw region of the shaft, logically also condemns the finding that plaintiff was not guilty of any want of ordinary care contributing to his injury. It seems that his conduct invited the disaster which happened to him. He subjected himself to many serious dangers, from the time he made the first step from the plank to the tightener frame till he put his foot, or caused it to go, between the jaws formed by the sprocket wheel and chain. His conduct was specially negligent in that he departed from his previously used but dangerous way of reaching the west tightener frame by trying to contend with the sprocket wheel shaft and its connections, the timber loaded with frozen sawdust, the interfering sawdust spouts, and the narrow plank suspended high above the basement floor,—in attempting to go by a short cut from the east to the west tightener frame. Can one without feeling a sense of shock at the very temerity of it, contemplate the picture found in the statement of facts of respondent for a moment before and at the instant of the accident? See him partly hanging to the east tightener frame by one hand and to the sawdust spout with the other, his left foot just under, and leg close up to, the moving sprocket chain, just the toe of one foot reaching under the chain far enough to obtain a rest on the cross-piece of the tightener frame, his right foot out and

around the sawdust spout; out to the top of the timber beyond the spout, his line of vision naturally directed away from that foot, and his dependency being upon sense of touch to obtain a safe lodgment for the foot on the sawdust covered timber. See him as, half clinging by his hands and arms, he feels for a footing at his right till his foot slips in on the sprocket chain close to the sprocket wheel and is instantly caught between the two. Does not the whole proceeding appear to have been almost foolhardy, when we consider that the ordinary way of approaching the tightener frames was from the opposite side, thus avoiding all the dangers which caused the injury, and that respondent chose to depart from his own customary and dangerous way to one very much more hazardous? Was he not negligent to the point of rashness, in view of the fact that he had been instructed to approach the tighteners from the south side and would have done so had it not been for the interference from the sawdust spout, which he could easily have remedied himself.

Quite as difficult, as in the respects we have treated, we find it to justify the finding that the set-screw did the injury to respondent's foot. At the best the evidence does not more than warrant the merest conjecture that the set-screw reached the foot which was injured. No amount of conjecture or weight of mere possibility can support a verdict in a plaintiff's favor. It must not be forgotten that reasonable certainty, at least, must be established in plaintiff's favor in a case of this sort, as well as in any other, to warrant a recovery.

First we have the fact that respondent's foot blocked the sprocket wheel so it stopped. Therefore the testimony that the set-screw continued to revolve after the foot engaged the wheel must be false. Motion of the wheel necessarily ceased, and that of the set-screw too, as soon as the man's foot was caught between the wheel and the chain, otherwise his leg would have been wound around it and crushed, as he admitted in his testimony. So the injury to the foot must have been done by the time the wheel ceased to revolve. The idea of the

set-screw going around thereafter is too preposterous to be worthy of a moment's consideration. Again, respondent said the set-screw gouged his foot down from the instep to his toes. Opposed to that is not only the fact that the wheel and the set-screw must have ceased to revolve as soon as the foot was caught, since otherwise the leg would have been crushed, but the location of the wound was not from the instep downward to the toes, but across the instep, just where it would naturally be if the foot were caught between the sprocket wheel and the chain and rolled partly under it and thereby crushed and wounded. Again, with the foot between the sprocket wheel and the chain, as the evidence strongly tends to, if it does not conclusively, show, and we are not prepared to say it does not, and as respondent insisted it was to some extent at least,—it was not possible for the screw to reach the foot. There was no room for the foot to get under the collar because it was revolving in a cut-out place in the timber. It was also physically impossible for the foot to have been under the shaft, between the timber and the sprocket wheel. The foot, as it slipped in between the sprocket wheel and chain, must have gone in substantially at right angles, as respondent several times substantially testified. In no other way could it have gotten into the machinery and stopped it. Any other theory would be worse than speculation as to mere possibility. In no other way could the wound have been made across the instep, since the set-screw did not go in reach of the foot. Moreover, when he was found by those who released him, the set-screw was pointing upward. That must have been its position when the sprocket wheel was blocked by the foot because all motion, as stated, must have ceased at that instant. In the position respondent's body was, his foot could not have been turned lengthways of the south edge of the timber and just over such edge so as to have been drawn under the collar or shaft, if there was a place there, which would have permitted it to have been drawn in.

The testimony of the witness called to corroborate plaintiff

was self-destructive so far as it was to the effect that the foot was caught under the shaft. He contradicted respondent as to taking the top off the journal box and lifting up the end of the shaft, and the incredible story of respondent as to his having reached and pushed his foot down and out. The witness and others, as he said, we must remember, put a lever under the shaft and "sprung her up a little," "gave it a little slack," then worked the foot out while respondent "hung to the frame or something." When we think of the short two-inch shaft running in a box, which we must assume was in fair condition, we can comprehend, at once, that the idea that they "sprung her a little," was a mere picture of the witness's imagination, or something worse. He testified to a physical impossibility. His words, "gave it a little slack," are the key to what was done. The only thing they could have given a "little slack" to was the sprocket chain. A "little slack" does not describe any movement that would have been required to get respondent's foot out from under the shaft, if it were possible for it to be there. Give it "a little slack" fittingly characterizes loosening of the sprocket chain. Rolling the wheel back slightly was the only practicable way to release the foot if caught between the wheel and the chain. "Pried her up," under the circumstances, in connection with the fact that the shaft was tight in the journal box, with "give it a little slack," tells the only true story it seems, *i. e.* they put the end of the lever under one of the projections of the sprocket wheel and against the timber or something for a fulcrum, or against the shaft on the south side of the wheel, and from there against the end of a link in the interval between two links at the side, or in some other way obtained a leverage by means of which they turned back the wheel sufficiently to "give it," the chain, "a little slack," and then, as the witness said, "they worked his foot out by hand." We note that the evidence does not indicate what kind of a lever was used. It might have been a bar of iron permitting of giving the chain a little slack in the

way suggested. We do not overlook the fact that the witness spoke of the lever as a "handspike," but that does not indicate but what it might have been of iron or in such form as to permit of the use indicated. Respondent must have been hanging onto something while he was being released, as the witness said, in order to support himself. That something must have been the sawdust spout. Doubtless, as he testified at one point, he was so excited he could not remember just how the accident occurred or how he was released. It was simply impossible for him to have leaned down, as he said he did, and with both hands taken hold of his foot and crowded it down between the sprocket wheel and the timber. He could not have kept his place on the timber while making such a movement. Moreover there was no place, as we have seen, for his foot to be so crowded down and out. The gouged-out space was occupied by the collar, allowing the rim of the wheel to come within about two inches of the timber. Is not that plain when the whole situation is comprehended.

Again, crowding the foot down and out was impossible since it was caught at some point between the wheel and chain requiring the latter to be given "a little slack."

On the whole, it seems clear that the injury was not caused by the projecting set-screw. Too bad, we fully appreciate, the unfortunate plaintiff must irreparably bear his loss. The law does not deal in charity, merely taking from one who will not suffer much by the deprivation, and giving to another who will otherwise seriously suffer. It does not judicially punish one for the benefit of another whom he has not wronged, however much that other may need the assistance. It takes from one who commits a wrong to another's loss, giving the net of that which is taken to that other, not considering any loss for which the one is not responsible, nor any loss for which such other is himself responsible.

*By the Court.*—The judgment is reversed, and the cause remanded with directions to render judgment for defendant.

MARSHALL, J. (*speaking independently*). As the writer rests from speaking the foregoing for the court, may he not, appropriately and beneficially, soliloquize briefly upon the law's uncharitableness with distressing losses like that here treated.

Why not such inevitable incidents of activities upon which all depend to satisfy demands of legitimate human desire, be laid at once upon the subjects of consumption where they must in the end inevitably go for final liquidation? Why not with a minimum of anguish instead of with the maximum thereof? Is it not for the whole, indirectly toiled for but removed in general from the zone of danger as well as those who present their bodies to the peril, that the latter be so? If so, why should an element as to either, involving no moral turpitude, be the deciding factor as to whether the one or the other shall be irreparably impaired? And moreover, why irreparably impaired at all, crushing human ambition, human hope, and human life as well? Why should not the sacrifices for all be taken at once as the burdens of all; not scattering by the way human wrecks to float as derelicts for a time, increasing the first cost till the accumulation disappears from view in the world of consumable things? Such losses, starting immediate victims,—particularly the weakest and humblest and often the most indispensable of them to a lower level,—go on by trackless ways till, enhanced by transition over the long road, the whole, disseminated so broadly as to be at last unappreciable, comes to rest as noiselessly, imperceptibly, and certainly as moves the "breath of the summer night,"—upon and is absorbed in, increasing the costs of subjects of human desire, there to be accounted for at the full money equivalent by the exchanges incident to consumption. Is not this a verity? Why then cannot such inevitable end occur without the added loss and arbitrary classification by which the majority of those who feel the misfortune most deeply, are not compensated at

Houg v. Girard Lumber Co. 144 Wis. 337.

all, and the rest only by transfer in each instance to one engaged with the bodily sufferer in mutuality of general purpose and mutuality of risk from inadvertences which can only be minimized according to the degree of natural infirmities of the mutual actor? The courts cannot answer. They do not make the law. They only execute it, and must do that with fidelity and with care without sympathy or fear or favor. Only the lawmaking power can answer. At its door lies the duty to do so, and will lie any sin there may be in not laboring to that end. To there in increasing volume points and will continue to point unrequited sorrow till there shall be a remedy. If these words shall help to render humanity's petition effective they will not have been spoken in vain.

KERWIN, J. (*dissenting*). Three reasons are given in the majority opinion why the judgment below must be reversed, each involving the sufficiency of the evidence. These reasons are: (1) that the set-screw was not so located as to be dangerout to employees in the discharge of their duties; (2) that the plaintiff was provided with a safe place in which to do his work and chose an unsafe one, in consequence of which he received his injuries; (3) that the set-screw in question did not cause the injury. In attacking the findings of the jury as not supported by the evidence on these points the majority opinion recognizes the well settled rule that if there is any credible evidence to support a finding of the jury it cannot be disturbed, and also recognizes the equally well settled rule that where the trial court, on motion to set aside the verdict as contrary to the evidence, approves it, the judgment of the court below should not be reversed unless clearly wrong. In view of these established rules and also recognizing the further rule referred to in the majority opinion, that "physical situations and impossibilities speak much more weightily than the vocal utterance of any witness," I am of the opinion that

the verdict is well supported by the evidence, therefore the judgment should be affirmed.    I shall consider the three propositions referred to in their order.

1.  The finding that the set-screw was so located as to be dangerous to employees in the discharge of their duties in my opinion is amply supported by the evidence.    It is said in the majority opinion that the set-screw was entirely out of reach of the employees in the discharge of their duties, since it was eleven feet above the basement floor, and that there was no occasion to go near it except to oil the bearings of the sprocket wheel shaft.    But it was necessary in oiling the sprocket wheel to go within a few inches of the set-screw.    Whatever way the plaintiff took to go to the place of oiling was not material upon the question of whether the set-screw was so located as to be dangerous to employees in the discharge of their duties, if it was necessary in the discharge of their duties for employees to be at such place, and such place was in fact dangerous because of the unguarded set-screw. When plaintiff oiled the journal, which it was his duty to do, he was within a few inches of the set-screw.    He had to go to it either by going up on the inside and walking on the timbers to it, or by going up on the outside and reaching it from the plank on that side.    Neither on the inside nor the outside could the point be reached so as to do the oiling without coming in close proximity with the set-screw.    If, as I shall hereafter undertake to show, the use of the plank in doing the oiling was authorized by the defendant and reasonably safe for the purpose of reaching the place of oiling, and the set-screw was so located as to be dangerous when plaintiff was so in close proximity to it, then it was the duty of the defendant to guard it.    As a matter of fact, the set-screw being south of the oil cup, plaintiff would be nearer to it when oiling from the south side than when oiling from the north side, where he was at the time of the injury.    Moreover, it appears from the evidence that it was rather dark at the place in ques-

tion.   So it seems clear under the authorities that the evidence
was ample to warrant the jury in finding that the set-screw
was so located as to be dangerous to employees in the discharge
of their duties.   *Miller v. Kimberly & Clark Co.* 137 Wis.
138, 118 N. W. 536; *Chopin v. Combined Locks P. Co.* 134
Wis. 35, 114 N. W. 95; *Walker v. Simmons Mfg. Co.* 131
Wis. 542, 111 N. W. 694; *Kreider v. Wis. River P. & P. Co.*
110 Wis. 645, 86 N. W. 662.

In *Kreider v. Wis. River P. & P. Co., supra,* the court,
after referring to several cases in this court, said: "Most of
the cases leave it to the jury to say whether the unguarded
shaft or gearing was so located as to be dangerous."

In *Walker v. Simmons Mfg. Co., supra,* the set-screw in
question was in a shaft some nine feet above the floor, in a
place where it was contended it could interfere with no one
and where no person had any right to go in the discharge of
his duties, and that the injured party was outside of his al-
lotted territory when injured; but the court held that the
question of whether the set-screw was so located as to be dan-
gerous was a jury question.

In *Chopin v. Combined Locks P. Co., supra,* the same con-
tention was made as in the preceding case, and it further ap-
peared from the evidence that at the time of the injury there
was another way in which the injured party could have
reached the place of performance of his duties without passing
by the set-screw, and that the only duty which would require
an employee to be near the set-screw was in oiling, and it was
held that whether or not the set-screw was so located as to be
dangerous to employees in the discharge of their duties was a
jury question.

In *Miller v. Kimberly & Clark Co., supra,* there was evi-
dence that the defective shafting was suspended so high above
the working floor as to be beyond the reach of servants in the
discharge of their duties, but that the servant in the perform-
ance of some of his duties occasionally, as the master knew,

would walk upon timbers in the vicinity of the unguarded shafting. It was held that the master ought reasonably to have apprehended that the condition of the shafting endangered the servants. In this case also the injured person had to go out of his ordinary course in order to come in contact with the set-screw.

2. Regarding the contributory negligence of the plaintiff the majority opinion holds that plaintiff was guilty of negligence which contributed to his injury in not approaching the tightener from the south side or going up in what was called the inside way. While it is true that plaintiff did ascend on the south side and do the oiling for several months by going up that way, there is ample evidence to support the findings that after some remodeling and improvements in the mill plaintiff placed the plank in question, upon which, in connection with a ladder, he approached the tightener, and that this mode of doing the work was permitted by defendant and was a more convenient and safer way than the manner in which he formerly had done it, and that he continued to do his work by going up on the north side for a month before the injury. It also appears from the testimony that before plaintiff put up the plank on the north side he informed the millwright that he intended to do so and told him that it would be handier to do the oiling in that way, and that the millwright said, "I don't care," or "Do as you please." So I think there is ample evidence that this appliance to enable oiling from the outside was put up with the knowledge and consent of the defendant's millwright. I think the evidence is ample also to warrant the jury in finding that the outside way of oiling, by going up upon the plank, was at least as safe, if not safer, than the inside way. Plaintiff so testified and also testified to various chains, saws, flying splinters, timber, and divers other things which had to be encountered when doing the oiling by going up on the inside. Besides, a platform extended only part of the distance and he had to walk upon timbers in going to the

place of oiling. He testified, in reply to a question as to whether the outside way of doing the oiling was the more dangerous, "No, sir; it was more danger from the inside than from the outside where I was caught."

Plaintiff gave considerable evidence in detail respecting the dangers which he encountered in going up the inside way. He testified in effect that a saw was from twelve to fourteen inches from him in oiling the tightener and that there were all kinds of chains and shafting there; that in order to get to the place where he worked at the tightener he went half way on the platform and the rest of the way on the timbers, which were usually covered with sawdust. Sometimes in going up to oil the tightener he would be so close to the chains that they would rub against his side; that he had nothing to stand upon when he went up behind except the timbers; nothing to take hold of, only put his hand on the frame of the tightener, and that the saw which worked on the slash table threw pieces of wood and slivers with much force.

Stress is also placed on the fact that the evidence conclusively shows that plaintiff was guilty of contributory negligence in getting down from the tightener frame in the manner he did. It appears from the evidence that he was obliged to get from the plank onto the tightener frame as he did in order to do the oiling; that for a month before the injury he had been getting down from the tightener frame after oiling by first stepping from the lower timber of the frame onto the timber below and then onto the plank, which was from fourteen to sixteen inches north of and parallel with the timber, but that on the day in question he could not get a foothold on the timber because of the accumulation of frozen sawdust, and that he then moved westward on the timber, putting his left arm around the tightener frame and holding onto the sawdust spout with his right hand. It was about twelve inches from this spout to the sprocket wheel. He moved in this way, as the evidence tends to show, for the purpose of

reaching a point where he could get a foothold on the timber and get onto the plank and thus proceed upon it to the west tightener. Had it not been for the frozen sawdust on the timber parallel with the plank and about eight inches below the lower timber of the tightener frame on which he stood, he would have gone on the plank in the usual way. Plaintiff testified that he did not intend to work his way out on the timber to the other tightener; that he had to get out on the plank to get to the next tightener and did not intend to go along the timber to the other tightener.

It is obvious from plaintiff's evidence that it was dangerous at least for him to attempt to get onto the plank from the tightener frame. He says he could not; that since he could not get a foothold below, together with interference by a timber above near his shoulders, he could not turn around so as to get onto the plank without first getting a foothold on the timber which was parallel with the plank; that he could not turn around in the position he was in when he tried to get off the frame; that there was no other way to do the oiling except from the inside, which was more dangerous. It seems to me clear, therefore, that in the situation in which plaintiff was placed, upon the evidence, it was for the jury to say whether the plaintiff was not in the exercise of ordinary care and guilty of no negligence in moving his foot west of the sawdust spout in order to get a firm footing and thus get upon the plank from a point west of the spout. He testified that the method of getting down was to get onto the timber, then turn around and step out upon the plank, then proceed along the plank to the other tightener, which was located about five feet west of the east tightener. A very vivid picture of plaintiff on the tightener frame and his recklessness in assuming such a position is painted by the writer of the majority opinion. But there is abundance of evidence to the effect that the inside way was more dangerous than the outside way which was pursued by plaintiff for a month before the injury and, as plaintiff

says, with the knowledge and consent of defendant.   Under sec. 1636*jj,* Stats. (Supp. 1906: Laws of 1905, ch. 303), assumption of risk is out of the case (*Monaghan v. Northwestern F. Co.* 140 Wis. 457, 122 N. W. 1066; *Lind v. Uniform S. & P. Co.* 140 Wis. 183, 120 N. W. 839) ; and whether the plaintiff was otherwise guilty of negligence contributing to the injury was for the jury.   *Miller v. Kimberly & Clark Co.* 137 Wis. 138, 118 N. W. 536; *Chopin v. Combined Locks P. Co.* 134 Wis. 35, 114 N. W. 95; *Walker v. Simmons Mfg. Co.* 131 Wis. 542, 111 N. W. 694; *Klotz v. Power & M. M. Co.* 136 Wis. 107, 116 N. W. 770; *Novak v. Nordberg Mfg. Co.* 141 Wis. 298, 124 N. W. 282; *Clary v. C., M. & St. P. R. Co.* 141 Wis. 411, 123 N. W. 649; *Lipsky v. C. Reiss C. Co.* 136 Wis. 307, 117 N. W. 803; *Grimm v. Milwaukee E. R. & L. Co.* 138 Wis. 44, 119 N. W. 833.

In *Richmond & D. R. Co. v. Powers,* 149 U. S. 43, at page 45 the court said:

"It is well settled that where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this, whether the uncertainty arises from a conflict in the testimony, or because the facts being undisputed, fair-minded men will honestly draw different conclusions from them."

3. It is also held in the majority opinion that the evidence is not sufficient to support the finding of the jury to the effect that the set-screw did the injury to plaintiff's foot.   On this point as on the others heretofore treated I think there is an abundance of evidence, and that while it is evidence, in the main, from the mouths of witnesses, it is not against physical facts, nor is it incredible.   It is said in the majority opinion, "at best the evidence does not more than warrant the merest conjecture that the set-screw reached the foot which was injured."   This is a very strong statement in face of the fact that there is positive testimony of a witness other than plaint-

iff, apparently credible, to the effect that the foot was caught fast under the collar in which the set-screw was located and that he helped to release the foot.

It is true there is some conflict in plaintiff's evidence regarding how he got his foot caught. He first speaks of it being caught in the sprocket wheel, but afterwards explains that only the toe of his rubber was caught in the sprocket wheel and that his instep was caught under the collar and as the shaft turned the set-screw gouged out his instep. Of course if the foot was caught in the sprocket wheel and immediately stopped it and was not in contact with the set-screw, there could be no gouging out of the foot as testified. But it will be remembered that the sprocket wheel and collar in which the set-screw was situate were only about two or three inches apart, and the toe of the rubber might easily be in the sprocket wheel and the set-screw and collar in contact with the instep at the same time, and the toe of the rubber and heavy footwear worn at the time, together with the instep crowded under the collar, might have stopped the sprocket wheel and shaft, as it appears from the evidence the sprocket wheel did stop after the set-screw had revolved several times and gouged out plaintiff's foot. It is also said in the majority opinion that it was impossible for the screw to reach the foot because the collar was revolving in a cut-out place in the timber, and that it was physically impossible for the foot to have been under the shaft between the timber and the sprocket wheel, because it must have gone in at right angles, and that in no other way could it have gotten into the machinery and stopped it. There is evidence that the sprocket wheel was eight and one-half inches in diameter from point to point of the sprocket prongs and that the prongs were one and one-half inches long and the shaft was two inches in diameter. This would give about three inches projection beyond the surface of the shaft to the point of the sprocket prongs, and the collar was one and one-half inches from the shaft out, and the set-screw extended

beyond the collar about three-fourths of an inch, or out nearly as far from the shaft as the sprocket wheel. So from this it will be seen that even if the contact of the foot was at right angles when the toe of the rubber was in the sprocket wheel and probably between the prongs, the instep would be in contact with the set-screw. Besides, it is by no means clear that the foot reached the shaft at right angles. It also appears that a timber under the shaft was gouged or dished out so as to make room for the collar to revolve, but the extent of this dishing out does not appear definitely from the evidence. However, the plaintiff testified that his foot was between the shaft and the timber, and every time the set-screw came around it dug into his instep and dug out about two or three inches wide of the instep. The witness Peterson testified that plaintiff's right foot was fast under the collar and was not fastened in the sprocket wheel at all and that a set-screw projected from the collar five-eighths of an inch at least. The foot was in so it could not be pulled out; they did not take the shaft out of the box, but "pried her up with a handspike, sprung her." True, there is some conflict as to whether the top was taken off the box to get the shaft up. Peterson says it was not taken off, and plaintiff testified that his foot was gotten out "by taking the top casting off and prying the shaft up, on account of that shaft was under another bigger shaft further out." Whether the top of the box was taken off or whether the foot was taken out by prying and springing the shaft was a jury question. The plaintiff in his complaint and by his evidence seems to rest his case on negligence of defendant to guard the set-screw. It would seem that if the defendant was negligent in maintaining the unguarded set-screw it was likewise negligent in maintaining the unguarded sprocket wheel and chain. Sec. 1636*j*, Stats. (1898), is quite broad and requires the owner or manager to securely guard or fence all belting, shafting, gearing, hoists, fly-wheels, elevators and drums therein which are so located as to be dangerous. This

language would seem to be broad enough to cover a sprocket wheel operating on a shaft with a sprocket chain upon it when so located as to be dangerous to employees in the discharge of their duties.    But even if we confine the negligence strictly within the terms of the complaint, namely, an unguarded set-screw, we think the evidence sufficient.

After a careful reading of all the evidence and with due regard for the majority opinion I cannot bring myself to the conclusion that the findings of the jury are not supported by the evidence.    In this conclusion I am supported by the learned and able judge who tried the case and two members of this court, as well as the rule of this court to the effect that findings of the jury can be disturbed only in cases where reasonable minds can come to but one conclusion.

I am authorized to say that Justice SIEBECKER and Justice TIMLIN concur in the foregoing dissenting opinion,

A motion that the mandate be modified so as to provide for a new trial was denied April 5, 1911.