OKONSKI, Respondent, vs. THE PENNSYLVANIA & OHIO FUEL COMPANY, Appellant.

*April 24—May 13, 1902.*

*Master and servant: Injuries through negligence: Fellow-servants:
Special verdict: Instructions to jury.*

1. In an action for personal injuries sustained by a common laborer upon defendant's coal docks, alleged to have been caused by negligence of the foreman in placing the tripping device upon a wire cable, whereby the coal in a bucket running upon said

cable was dumped outside of the hopper into which it should have emptied, and upon the plaintiff, who was passing beneath, there was no claim that there was any defect in the apparatus itself or in the system by which it was generally operated; and it appeared that the shifting and placing of the tripper was merely a detail in the operation of the apparatus, done frequently in the unloading of a vessel, and commonly by members of the working force to which plaintiff belonged. *Held,* that in so placing the tripper the foreman was merely a fellow-servant of the other employees, including plaintiff, and that for any negligence therein the defendant is not liable.

2. In such a case the facts that the foreman had authority to hire, discharge, and direct the dock force, and was charged with the duty to see that the docks were so operated as to be safe, and to provide necessary lights, signals and warnings, did not render him other than a fellow-servant of plaintiff while performing the specific act mentioned.

3. It appeared that it was customary, when unloading a vessel at night, to place gasoline torches at the hoppers into which the coal was to be dumped, and that this was the duty of certain of the dock force known as "water boys." Defendant had provided such torches. *Held,* that the omission to use them at the moment of plaintiff's injury, if negligence, was negligence of his fellow-servants.

4. The submission, in a special verdict, of numerous questions relating to merely evidentiary facts, and the giving of instructions, in connection therewith, containing unnecessary statement of general rules of law, are criticised.

APPEAL from a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

Action for personal injuries suffered by the plaintiff as an employee in the coal yard of the defendant at Manitowoc. That yard was about 500 feet long north and south, bounded on the east by the slip into which vessels entered. Immediately adjoining the water were a series of four towers on tracks parallel to the dock line, some thirty-five feet high, in each of which was situated a steam engine and its operator. Extending from each of these towers westward to the hard coal shed, a distance of about 150 feet, was a steel cable, upon which the buckets lifted from the vessel were transported by

the engine located in the tower. The coal carried in these buckets might be delivered at various points between the tower on the east and the coal shed at the extreme western terminus of the cable. Thus, immediately west of the row of towers was an open space of perhaps seventy-five feet in width, known as the "platform," upon which it was customary to dump soft coal, and which at times was piled up over its whole surface therewith, although at the time of the injury it was nearly free from coal. Next to this open space were a series of four hoppers, about twenty-eight feet from the ground, located one under each of the cables and each communicating over screens with a railroad track, onto which cars were customarily run to receive coal which it was desired to put immediately aboard cars. The buckets held about a ton of coal each. The usual method of causing them to dump at one place or another was by placing upon the cable, at about the spot, a device called a "tripper" or "dumper," which, coming in contact with the latch upon the bucket, caused it to empty. These trippers also ran on trolley wheels along the cable, being secured at the westerly end to the stanchions of the shed and running down by their own weight when the rope holding them was loosened. When it was desired to empty the buckets at any point between the tower and the shed, this tripper was, by certain of the employees, lowered down by this rope to the desired point, and the rope then secured. The method of doing this was for a man to go up to the roof of the shed to handle the rope, and another to stand in his sight upon the platform, and signal to him when the proper point had been reached.

At a little after 4 o'clock on the day in question, to wit, the 30th day of November, 1897, the unloading of a new vessel was commenced, and the buckets, which from the preceding vessel had been emptying at their extreme western terminus into the coal shed, were desired to be emptied into the hoppers above spoken of, adjoining the railroad track. Ac-

cordingly, one Graham, who is designated as a foreman, directed two of the men on the dock to go up and lower the tripper on the southernmost cable, known as "cable No. 1," saying that he would signal to them when it had reached the right point. This process was called "spotting." They untied the rope, cast off a considerable amount of slack, and let the tripper run down. For some reason—whether because they did not keep sufficient control of it, or because Graham did not signal soon enough—it ran down to a point some ten or fifteen feet east of where it should be for the purpose of making the bucket empty into the hopper, and Graham immediately gave signals to haul it back, but before that could be done the engineer in the tower sent a bucket of coal westward on the cable, having no knowledge of what was going on at the other end. The bucket came in contact with the tripper, and its contents were precipitated onto the platform just as the plaintiff was passing under the cable in the performance of his duties in going toward the south end of the yard to aid in pushing down some railway cars.

It was in proof that it was a stormy night, and quite dark, but that the yard was lighted by eight electric lights, so that the cable was easily in sight of those walking under it; but there was evidence also that it was customary to fix a gasoline torch near the eastern corner of the hopper when dumping coal there, which enabled the engineer in the tower to see when the bucket approached its destination, and slow it up somewhat before its collision with the tripper. Those torches were supplied, and it was the duty of certain members of the crew in the yard to put them in place when desired by the engineers. None had yet been placed on the hopper near which plaintiff was injured. Plaintiff had worked about coal yards for twelve or fifteen years, but upon this particular yard, which varied somewhat in its apparatus, only about six days. The work done upon the dock and yard was various, consisting generally in the unloading of coal from

the vessels, the distribution thereof to various parts of the yard both by the cables in question and by wheelbarrows, the incidental screening of it, the loading upon railway cars, and the removal of the screenings to other parts of the yard. Plaintiff was a common laborer engaged in such work as was indicated to him, and on the day in question had been wheeling soft coal from the north end of the platform to some other point. At the time of injury, as already stated, he had started with two other men to move cars down onto the railway track adjoining the hoppers.

Motion to direct verdict for defendant was overruled, and a special verdict in answer to twenty-seven questions was taken, upon which, after motion for new trial, judgment was rendered in favor of the plaintiff, from which the defendant appeals.

For the appellant there was a brief by *Nash & Nash,* and oral argument by *L. J. Nash.*

For the respondent there was a brief by *O'Connor, Schmitz & Wild,* and oral argument by *A. J. Schmitz.*

DODGE, J. The most vital question presented among the many assignments of error is whether there is any evidence to warrant the jury in finding any failure on the part of the defendant in its duty to provide a safe place for plaintiff to work and safe appliances to work with. Neither in the complaint nor in the evidence is there any suggestion that either the place or the apparatus was unfit, dangerous, or defective, as orginally constructed. The allegation is that the passing bucket was negligently tripped by an agent or agents of defendant; that the tripper or dumper was negligently placed on said cable too far east, by and under the direction of the foreman or manager of said coal docks, and by certain men employed to assist in operating and handling machinery. Thus it is seen that the negligence complained of is that of certain persons in doing a momentary act at the time of the accident,

not a condition of either place or apparatus which had been provided for the general purpose of unloading and handling coal in the yard. Obviously, then, we are brought to the question whether the person or persons whose negligence caused the injury were fellow-servants of plaintiff in the legal significance of that term.

Fellow-servants are defined by Bouvier as "those engaged in the same common pursuit, under the same general control" (1 Bouv. Dict. Rawle's Revision, 768); by Bailey, as "persons . . . employed in the same general business by a common employer" (Bailey, Mast. & S. § 1796). It is, however, well recognized that if a master delegates the performance of his legal and contractual duty to prepare the place or apparatus for use, the delegatee in performing that duty is not deemed a fellow-servant with those who may afterward use the place or apparatus so prepared. But it is also entirely well settled that the rank or grade of the person doing any work, or, indeed, the character of his general duties, do not control the question whether he is a co-employee with others in doing any specific act. That depends on the character of the particular service in the performance of which he is charged with negligence. Neither is the question controlled by the fact that different parts of the work necessary to the general enterprise are placed in hands of employees remote from each other, and receiving immediate command from different superiors, or, indeed, one from the other. *Hoth v. Peters,* 55 Wis. 405, 13 N. W. 219; *Toner v. C., M. & St. P. R. Co.* 69 Wis. 188, 31 N. W. 104, 33 N. W. 433; *Dwyer v. Am. Exp. Co.* 82 Wis. 307, 52 N. W. 304; *Porter v. S. C. & M. Coal Co.* 84 Wis. 418, 54 N. W. 1019; *Hartford v. N. P. R. Co.* 91 Wis. 374, 379, 64 N. W. 1033; *Klochinski v. Shores L. Co.* 93 Wis. 417, 67 N. W. 934; *Prybilski v. N. W. C. R. Co.* 98 Wis. 413, 74 N. W. 117; *Portance v. L. V. Coal Co.* 101 Wis. 574, 77 N. W. 875.

The question whether or not Graham or those who were

lowering the tripper were fellow-servants of plaintiff in adjusting it was not submitted to the jury, nor passed on by them. They were asked merely whether Graham was the representative of the company, with authority to hire, discharge, and direct the dock force, and charged with duty to see that docks were so operated as to be safe, and to provide necessary lights, signals, and warnings; all of which they affirmed. These facts were inconclusive. Graham might have occupied any—even the highest—grade of employment, and still have been a fellow-servant in any specific service. That he represented the master in hiring men might have made defendant liable for hiring of known incompetents by him; that he had authority to provide lights, signals, or warnings might have resulted in the master's liability if defective ones had been provided; but neither fact would warrant liability for his negligence in performing some of the general work in which the yard force were engaged. A quarry company, for illustration, would no more be liable for injury to him who held a drill from negligence of the wielder of a sledge because the latter happened to be the general manager of the business and the former the lowest of laborers.

From what has been said it is apparent that the verdict does not support the judgment, and examination of the evidence becomes necessary to ascertain whether the defect is supplied thereby. Upon such examination we find the testimony as to the character of Graham's service in "spotting" the tripper to be all one way, and without dispute. The whole apparatus had been supplied by the defendant. It included as one of its elements the tripper device, with its appliances, as described in the statement of facts, for adjusting it to the particular place of emptying the buckets of coal; and involved the process of one or more men lowering the tripper to such place with the aid of another man to indicate it by signal. No defect is suggested, either by complaint or by evidence, in the apparatus itself, or in the system by which

it was customarily operated. The testimony is also wholly without conflict that the shifting and placing of these trippers was simply a detail in the operation of the apparatus, necessary to be done frequently in the course of unloading and distribution of the same boat load of coal. It also shows that it was done commonly by members of the force performing that general work. Thus a man, Jarnek, with whom plaintiff was working at the very time of his injury, usually did such work in the daytime, and a similar employee, McCarty, in the nighttime. All that could, by any possibility, be deemed an act of the employer, might be the information as to where coal should be distributed. The yard force thereupon manipulated the details of the labor and machinery whereby that policy was to be accomplished. This was as much a detail of the operation as the act of the hoister in handling the throttle of his engine according as the bucket was to be sent a longer or shorter distance, or of the bucket loaders in latching the bucket before starting on its trip.

We have no hesitation in reaching the conclusion that one performing that act was, in so doing, a fellow-servant with the other employees on the dock, and that for any negligence therein the master would not be liable under the authorities above cited. Since the complaint alleges no other ground of liability, such conclusion would seem to fully dispose of the case.

It, however, appears that the court admitted evidence, and submitted to the jury as an issue, the question whether the failure to place a torch on the east side of the coal hopper was negligence proximately causing the injury. In thus permitting plaintiff to travel outside the issues framed by the pleadings, we think specific error was committed, but do not pause to discuss it, since the same views above expressed with reference to spotting the tripper apply with equal force to the placing of such torches, and render the fact inconclusive upon defendant's liability. The evidence shows conclu-

sively that when, in the course of distributing the coal from
a vessel, it was to be dumped into the hoppers, it was cus-
tomary, as one of the details of the adjustment of the ap-
paratus, to place a torch on the hoppers, and that this was the
duty of certain of the dock force known as "water boys."
The defendant had provided torches and apparatus.    The
omission to use them at the moment of plaintiff's injury, if
negligent, was the negligence of those associated with him in
a common service.

Were the views already expressed less conclusive, not only
of this appeal, but apparently of the case itself, we should feel
obliged to go at length into commentary upon the manner of
the submission of the case to the jury, and to make both the
special verdict and the instructions accompanying it our
text. The verdict contains twenty-seven questions. By far the
greater majority thereof relate only to evidentiary facts, and
some of the ultimate issues of fact are not submitted. In the
view of the evidence obviously taken by the trial court, those
issues were:   first, With reference to the placing of the trip-
per, was Graham a fellow-servant; and, secondly, Was he
negligent?  Neither of these issues are submitted.  With ref-
erence to the torch, supposing the subject had become properly
a part of the case, the issues were whether its absence ren-
dered the place of work unsafe, and, if so, whether the de-
fendant had failed to supply such device, or whether its ab-
sence was due to the neglect of fellow-servants to perform the
duties imposed upon them.    These are not directly submit-
ted in any questions of the special verdict.   It is true that
upon these questions there was no conflict of evidence, but
that consideration, while it might justify the omission of
questions covering such issues, rendered improper the sub-
mission of any question whatever with reference to the torch,
its absence, and the effect thereof, of which there were several.
The question of proximate cause was not inaccurately de-
fined, but was submitted by three questions, one of which

fully covered the subject, and the other two were but cross-examination, presenting to the jury ideas which might, ought properly, and, indeed, were, communicated to them by instructions, to guide them in answering the simple question whether the absence of torch and misplacement of the dumper were the proximate cause of the plaintiff's injury.

In the instructions we find quite extended declaration of general rules of law governing the duty and responsibility of the master to his servants, which were wholly unnecessary, and which approached closely, at least, to the forbidden field of informing the jury of the effect of answers to certain of the questions, and which were at least much better omitted from the instructions and reserved in the breast of the judge as his guide in deciding what judgment should result when the jury had settled the issues of fact. It is due to the trial judge to note, however, that this case was tried not only at an early stage in his judicial career, but before the recent cases commencing with *Ward v. C., M. & St. P. R. Co.* 102 Wis. 215, 78 N. W. 442, followed by *Rhyner v. Menasha,* 107 Wis. 201, 83 N. W. 303, and *Byington v. Merrill,* 112 Wis. 211, 88 N. W. 26, wherein this court has indicated more at large than formerly the proper method of submitting cases when special verdicts are demanded.

Many other assignments of error are predicated upon details of the trial and submission of the case, but need not be discussed, nor decision thereon announced, in view of the conclusion we have reached upon the merits. From what has already been said thereon, we must hold that the trial court erred in refusing to direct a verdict for defendant and in denying the motion to set aside the verdict and grant a new trial, and from such errors reversal follows.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.