KNUDSEN, Administratrix, Appellant, vs. LA CROSSE STONE COMPANY, Respondent.

*February 1—March 14, 1911*

*Master and servant: Injury: Unsafe working place: Liability of master: Presumptions: Negligence of fellow-servant: Foreman.*

1. The master should furnish his servants with a reasonably safe place to work; reasonably safe instrumentalities with which to do the work; and fellow-servants provided should be reasonably safe as such,—the standard of care as to each duty being such as is exercised by the great mass of mankind under the same or similar circumstances.
2. The presumption of fact is in favor of the master having performed the duties mentioned till overcome by evidence establishing the contrary to a reasonable certainty.
3. The safe-place rule having been satisfied at the start, and the conditions being such that thereafter the servants necessarily are expected to make their own working places, which must, necessarily, change from time to time and at short intervals as the work proceeds, dangers created are not attributable to the master.
4. In the circumstances last mentioned, negligence of one or more of several servants, not excepting the foreman of the crew, rendering the working place of some other servant, or servants, unsafe is negligence of a fellow-servant.

5. In operations where the servants necessarily make their own working place, the safe-place-to-work rule has little or no application.

6. The foreman of a crew erecting a water tank, or removing heavy machinery from a car to a factory, or moving a pile-driver, or in charge of a train crew, or the crew of a vessel, or a dock crew in regard to all the details of the general employment as regards the safe-place rule, is a fellow-servant of the men under him.

7. A blaster working with others under a foreman, all constituting a stone quarry crew, is a fellow-servant of such foreman in respect to duties of the latter as to guarding against the working place of those under him being made unsafe by the rolling down from one level to another of earth or rock in the course of quarry work.

[Syllabus by MARSHALL, J.]

TIMLIN, SIEBECKER, and KERWIN, JJ., dissent.

APPEAL from a judgment of the circuit court for La Crosse county: E. C. HIGBEE, Circuit Judge. *Affirmed.*

Action to recover damages for the death of plaintiff's intestate. The deceased while employed by defendant as a blaster was killed, and, as alleged, under the following circumstances:

The intestate and others under a foreman were put to work for defendant in its stone quarry. There was a shelf of rock some ten feet wide, fifty to seventy feet long, and about fifty feet above the surface below, composed of rock. From the back side of the shelf a bank of rock and earth rose upwards, at a sharp angle backward, fifteen to twenty feet to the top of a hill or bluff. Plaintiff on the day in question, by direction of the foreman, was at work on the shelf drilling blast holes. Other employees had partially loosened portions of rock and earth from the edge of the bank above. A large mass at the edge had been loosened so as only to be retained from rolling down by the frozen condition and roots. While the situation was such that the partly loosened mass was liable to fall at any time, that was not apparent to a person on the shelf below. The rule of the quarry was that the fore-

man should, personally, see that no chunks of earth or rock were allowed to be so circumstanced as to be liable to unexpectedly roll down and injure employees, and to see that no such dangers existed before putting employees at work, as in the case in question, and, further, to have due warning given to employees within the zone of danger before allowing chunks of earth and rock to be loosened and rolled down the side of the bluff.    The situation in the particular case should have been known to the foreman before sending deceased to work on the shelf.    The latter was entirely ignorant of such situation and was not guilty of any want of ordinary care in respect thereto. As directed he commenced operations on the shelf in the forenoon of December 31, 1909.    He was not warned of the danger as before indicated.    He was assured that the place was safe and relied thereon.    While engaged in his work a large chunk of earth and rock suddenly became detached from the side of the bluff above and rolled down upon and killed him.

There were other allegations requisite to make out a cause of action if defendant was actionably negligent in respect to the cause of the death aforesaid.

Defendant answered putting in issue all allegations making out a breach of duty on its part and pleaded contributory negligence.

The evidence showed, or tended to show, this: The physical conditions were as alleged in the complaint.    In the progress of the work, from time to time, it was necessary to uncover rock further back on the bluff than the shelf where deceased was directed to work and above that point.    The work of uncovering at the particular time of year, because of the earth being frozen, required employees to go to the proper place at the crest of the bluff above the shelf, and by the use of wedges, crack off the frozen earth by strips and allow the same to roll down.    In the forenoon of the day in question the foreman directed one of the crew to do work of that sort and

marked off the particular strip of earth to be thrown down. By noon such strip had been sufficiently loosened to open up a seam back of it about six inches wide on the surface, and about ten feet long. The employee was then directed to help deceased on the shelf which was in the pathway of the partly loosened strip. The two commenced work on the shelf about 2 o'clock in the afternoon. They worked together a short time before noon. The foreman did not make any effort to discover the condition of things above the shelf. It was not observable to one circumstanced as the deceased was on the shelf and he did not know of it. While he was busily engaged and the foreman and one or two others were near by the strip of frozen earth came wholly loose, rolled down, and swept him from the shelf, causing him to fall on the rocks below with fatal effect. The foreman was under instructions to guard employees against such dangers. It was the custom for the foreman of a quarry to see that overhanging earth or rock was not left so as to be liable to roll down where employees were required to work and endanger their personal safety. The foreman in this case could have seen by casual observation before he sent the men to work in the afternoon that the strip of earth he had directed to be loosened had not been thrown down. Defendant relied upon such dangers as the one in question being prevented by the foresight of its foreman. He had full charge of the workmen and working conditions in the quarry. He directed operations as was necessary and himself took a hand in doing the work, sometimes at one place and sometimes at another.

The jury found thus: The working place where deceased was stationed was not reasonably safe. The frozen strip of earth was loosened by directions of the foreman. He directed deceased to work where he was located when swept from the cliff. The foreman did not know of the conditions respecting the strip of earth which had been partly loosened prior to the accident. In the exercise of ordinary care he

ought to have known thereof. He did not warn deceased of the danger. The latter did not know of the strip of earth having been loosened. He was not guilty of any want of ordinary care in that regard. He did not have facilities equal to the foreman for knowing of the danger. Such danger was the proximate cause of the disaster complained of. The direction given to the deceased to work where he did, under the circumstances, was a proximate cause of his death. The failure of the foreman to warn deceased of the danger was a proximate cause of his death. The deceased was not guilty of contributory negligence. If on the facts plaintiff is entitled to recover the measure thereof should be $7,900.

Judgment was rendered notwithstanding the verdict in favor of the defendant.

For the appellant there were briefs by *Jesse E. Higbee* and *Frank Winter,* and oral argument by *Mr. Higbee.*

For the respondent there was a brief by *McConnell & Schweizer,* attorneys, and *Quarles, Spence & Quarles,* of counsel, and a separate brief by *Bunge & Bosshard,* attorneys; and the cause was argued orally by *A. C. Fish* and *C. H. Schweizer.*

MARSHALL, J. So it will be seen the defendant, in the legitimate pursuit of an important industry, a vocation which it was as important to the public and defendant's employees should be carried on as to the defendant itself, sent a crew to its stone quarry property for the purpose of operating the same. The working place was safe as the crew took possession thereof. Thereafter they necessarily made, in great part, their own respective working places. The safety of one was greatly dependable upon the conduct of his fellows. All were employed in the common employment. From day to day the work went on. Proper regulations, so far as any were required, were made. The working place was in proper condition in the morning in question. So far as ap-

peared to respondent up to the instant of the accident, the foreman and all associated with the blaster, Mr. Knudsen, were reasonably careful men and competent, in every way for performance of the duties assigned to them. The instrumentalities furnished for the work were all right. It was left to the crew so organized and equipped to do the work, the foreman being specially charged to look after the safety of the men and, particularly, as regards dangers from being in the pathway of earth and rock that might roll down the bluff.

The operation which resulted in creating the danger was conducted for considerable length of time and not more than about twenty-five feet from Knudsen's working place. While he may have been so circumstanced that he could not see the person at work while creating the danger, the manner and kind of work was such that he must have known what was going on and known when, later in the day the workman left the point above on the crest of the cliff and joined him, that the strip of earth and rock the former had been endeavoring to disengage had not been thrown down, though it must be there was no appearance of danger of its falling which he observed or could well have observed.

As Knudsen was working in supposed security, the very person aiding him who had been the immediate instrumentality in making the working place unsafe, and the foreman who had charge of the whole work and aided manually from time to time, near by, no one apparently appreciating the danger, the chunk of frozen earth came loose, rolled down the cliff, and in an instant, as it were, Knudsen was swept over the cliff and his life terminated with the necessary distressing consequences to those dependent upon him.

Thus passes before us another of those tragedies which are constantly recurring in the drama, so to speak, of our official life. Is there a remedy for the damage caused by the inadvertent taking of Knudsen's life? The question is not whether there ought to be a remedy from the viewpoint of

moral standards. It matters not how much we may think such sacrifices should be compensated in some way and that the loss must inevitably be paid for in the end by the mass of mankind, if not in a way to reimburse appreciably those upon whom the loss first falls. Courts cannot shape their decrees to meet their personal ideas or merely satisfy human sensibilities to human sorrow and suffering; moreover, at the expense of those neither guilty of a legal or moral wrong.

The world does not appreciate the high order of courage and firmness required to deal with these painful tragedies and at all times be reasonably sure of judgment reigning supreme instead of being swayed by sympathy which we may venture to say is no more keenly felt than by the judges of our courts. However, to execute their functions they must, the best they can, come up to the high ideal of this picture so truly and so beautifully painted by Chief Justice RYAN and which is to go down the ages inscribed upon the shaft erected in his honor:

"In other places in life, the light of intelligence, purity of truth, love of right, firmness of integrity, singleness of purpose, candor of judgment are relatively essential to high beauty of character. On the bench they are the absolute condition of duty. The judge who palters with justice, who is swayed by fear, favor, affection or hope of reward, by personal influence or public opinion, prostitutes the attribute of God and sells the favor of his Maker. But the light of God's eternal truth and justice shines on the head of the just judge and makes it visibly glorious."

So the only question before us for decision is this: On the undisputed facts disclosed by the evidence, has appellant a legal remedy against respondent? It cannot be decided by any system of arbitration. It cannot be decided by bending established principles out of their legitimate sphere or developing new ones to meet the dire necessities of the particular case. That the time is at hand when a just way will be found for transferring the loss inflicted by such sacrifices to

so broad a field that all will be compensated and the partici-
pating compensators carry the load and think the burden
light if they appreciate it at all,—the writer has faith.

As we view the case it is governed by a few legal principles.
We will endeavor to state them briefly, concisely, and with
but little discussion. Their application to the facts will be
seen easily from their logical arrangement.

A master owes the duty to his servants of furnishing them
a reasonably safe place in which to do their work, of using
ordinary care to keep such place reasonably safe, of furnish-
ing them reasonably safe instrumentalities with which to per-
form their work, and of exercising ordinary care in the selec-
tion of servants whose work would otherwise imperil the per-
sonal safety of their fellows.

The presumption of fact, at the start, as to any given situ-
ation where liability of the master to the servant or through
him is in controversy, is that the duties of the former, indi-
cated, have been performed, and such presumption should
prevail wherever the fact is called in question till overcome
by evidence establishing the contrary to a reasonable cer-
tainty.

The master having furnished his servant a safe working
place and satisfied the other conditions, or put such servants
to work under such conditions that they must necessarily or
reasonably make their own working place, or the place origi-
nally furnished is changeable naturally by the members of
the crew as the work progresses, dangers thus created are not
attributable to the master. *Peschel v. C., M. & St. P. R. Co.*
62 Wis. 338, 21 N. W. 269; *Walaszewski v. Schoknecht,* 127
Wis. 376, 106 N. W. 1070; *Miller v. Centralia P. & W. P.
Co.* 134 Wis. 316, 113 N. W. 954.

The master having complied at the start with the condi-
tions mentioned, negligent conduct of one or more of a work-
ing crew proximately causing injury or death of an associate,
is negligence of a fellow-servant and not breach of duty of

the master.    Who is and who is not a fellow-servant depends upon the nature of the service.    So the foreman of a crew in exercising his functions as such in the common employment to accomplish a common purpose under one general management, some working at one detail, and some at another, is a fellow-servant, and the negligence of one is not attributable to the master except where aside from his fellow-servant duty that one performs by direction, express or implied, the work of the master as regards safe instrumentalities and safe fellow-servants or a safe place to work.

To illustrate the rule that where a working crew necessarily makes the working place, or places, for the members thereof or in due course constantly or at brief intervals change the same, we have this:

A crew under a foreman was employed to erect a water tank.    The working place in general and particular was under the control of the foreman and as to one member of the crew upon a particular occasion was dangerous causing an injury to him.    The negligence was held to be that of a fellow-servant. *Peschel v. C., M. & St. P. R. Co.* 62 Wis. 338, 21 N. W. 269.

In situations, in general, where the dangers of a working place are created by the servants themselves including the foreman and changed from time to time in the due course of operations the safe-place rule does not apply. *Strehlau v. John Schroeder L. Co.* 142 Wis. 215, 125 N. W. 429.    That was applied to a quarry crew in *Mielke v. C. & N. W. R. Co.* 103 Wis. 1, 79 N. W. 22, where a piece of rock rolled down on to a workman very much as in this case, and again so applied in *Pern v. Wussow,* 144 Wis. 489, 129 N. W. 622, where the fact was that a chunk of frozen dirt was cracked off by a workman, as was the case here, and it rolled down and injured a fellow workman.

The following are illustrations of the rule that the fore-

man of a working crew carrying out the details of an enter-
prise is a fellow-servant of the men under him: A gang in
the erection of a water tank.   *Peschel v. C., M. & St. P. R.
Co., supra.*   That case applies to the safe-place rule and
this feature of the law as well.   A gang engaged removing a
heavy machine out of a car and into a factory.   *Hamann v.
Milwaukee B. Co.* 127 Wis. 550, 106 N. W. 1081.   A crew
laying gas mains.   *Gereg v. Milwaukee G. L. Co.* 128 Wis.
35, 107 N. W. 289.   The men engaged in removing a pile-
driver.   *McKillop v. Superior S. Co.* 143 Wis. 454, 127 N.
W. 1053.   A conductor is the fellow-servant of a train crew
under him.   *Pease v. C. & N. W. R. Co.* 61 Wis. 163, 20
N. W. 908.   The master of a vessel of his mate and other
members of the crew.   *Mathews v. Case,* 61 Wis. 491, 21 N.
W. 513.   The dock foreman and his crew as to all details of
their general employment.   *Okonski v. Pennsylvania & O.
F. Co.* 114 Wis. 448, 90 N. W. 429.   The foreman of a
blasting crew and the men under him.   *Wiskie v. Montello
G. Co.* 111 Wis. 443, 87 N. W. 461.

Now look upon these familiar and thus plainly illustrated
principles and then on the picture of this case.   Does not the
one fit the other perfectly?   No complaint about the working
place except as to the change created by Mr. Knudsen's asso-
ciates after the crew went to work in the morning.   No com-
plaint about suitable tools or fellow associates up to the time
of the accident.   The foreman was very close to the members
of the crew, going now here and now there, directing opera-
tions; taking part from time to time in the physical labor,
helping this one and then that one as occasion required or op-
portunity afforded.   But a few hours before the accident he,
with Knudsen and another, or others, worked clearing off
loose dirt a short distance from where the fatal occurrence
took place.   The breaking down of earth and removing it
from over the rock to be quarried was one of the ordinary and

frequent operations in the quarry, particularly in the vicinity of where Knudsen was required to work and preparatory to such work. It was from every viewpoint one of the plainest of details in producing the general result to be accomplished. If due care on the part of the master required promulgation of rules in respect to preventing such dangers as that in question it seems that was done and the difficulty was respecting proper observation thereof.

Would it not be a plain violation of the stated principles to hold that it was the duty of the master to be present in person or by proxy with reference to such details as those mentioned? Such a rule would be utterly impracticable of observation. Here the master took the precaution to admonish the foreman to be alert in preventing just such dangers as the one which proved fatal to Knudsen; but that was plainly one of his ordinary duties as foreman, the proper performance of which Knudsen and all members of the crew took the chances of as ordinary risks of their employment. Such admonishment instead of being regarded as a transference of the master's duty to the foreman and so fix the negligence of the latter upon the former should be viewed as an extra and creditable precaution exercised to the end that the foreman as one of the crew should see that the particular detail was properly attended to.

So we cannot see any escape from the conclusion that the negligence which terminated the life of Knudsen is that of the man who loosened the bank of earth leaving it in a dangerous condition and then went to work with him in the line of danger from it, without informing him thereof, or the negligence of the foreman, or both, in any event, within the fellow-servant rule. Principles of law which are as binding on this court as written law, command it, furnishing one more in number of illustrations of the necessity for some practicable way of dealing with industrial accidents, mini

mizing the misfortune thereof in line with the enlightened spirit of the age which has been responded to in most every civilized country but our own, and which only the lawmaking power can furnish.

*By the Court.*—The judgment is affirmed.

Timlin, J. (*dissenting*).  I make no claim to possess that degree of tenderness and sympathy for the laborer expressed in the foregoing opinion and in *Houg v. Girard L. Co.* 144 Wis. 337, 352, 129 N. W. 633, 639, and in *Driscoll v. Allis-Chalmers Co.* 144 Wis. 451, 468, 469, 129 N. W. 401, 408. I proceed solely upon my understanding of the law and justice.

The decedent while engaged in drilling in a quarry with a rock drill was killed by a piece of frozen earth falling on him from a clay ledge above.  This frozen chunk had been loosened by some other workman some hours before and left hanging in a dangerous position.  After verdict in plaintiff's favor judgment was rendered against her on the sole ground that the deceased was a co-employee with McBride, the foreman in charge.  This is the only question in the case.

The defendant was a corporation and one of its officers testified:

"We had delegated to McBride the full charge and supervision of the work in the quarry.  He had authority to hire and discharge men and the direction of the men in the quarry. There was no one above him in the control of the work there. . . . At the time of this accident we had a rule in force for the operation of our quarry which dealt with the matter of hanging rocks and partially loosened rocks or earth.  The rule was to have everything as safe as possible. *Q.* What was the rule in regard to dealing with overhanging rocks or loosened or partially loosened rocks or earth in your quarry?  *A.* Why, the foreman who had charge of the quarry understands what was necessary to make it as safe as possible.  He understood this by his own knowledge of every-

thing about a quarry. *Q.* Did Mr. McBride understand this? *A.* Certainly. *Q.* And you had instructed him to keep the quarry as safe as possible? *A.* Yes, sir, as safe as possible. *Q.* He was the sole person in charge of that duty? *A.* Yes, sir. *Q.* You had at that time a rule in your quarry that overhanging rocks, loosened or partially loosened, or masses of earth were to be wholly detached, thrown down, or blasted off? *A.* Not any particular rule. *Q.* Isn't that a common, customary rule in force in quarries at all times? *A.* That is customary for the foreman to do that. If he didn't do it he would not be a competent foreman. *Q.* And you expected Mr. McBride to do so? *A.* Yes, sir. *Q.* And that was his duty? *A.* Yes, sir. Where there was an overhanging rock or dirt cliff near the face of the rock or above a man's head or some loose rock or dirt partially loosened, it was the duty of the foreman to get this down before the men worked around it. *Q.* You required your foreman to do that? *A.* Yes, he was to do that. *Q.* That is the sole purpose of having a foreman there? That is why you have a foreman, to see if the quarry is safe before the men have to work around it? *A.* The foreman has charge of all the work in the quarry. Everything that is done in a quarry is important work. The action of the foreman in taking down loose rock is not the only protection which the men have. If there is any overhanging rock or cliff forms when the men are working, they are expected to take it down."

The foreman, McBride, testified:

"I told Knudsen [decedent] to go to the ledge and drill. I didn't make any effort to find out anything about the top of the bluff before I told him to go in there. I know that men had been working up there during the day, but I didn't go up to ascertain whether there was any loose or partially loosened earth up there. There was a path leading up there. It was about ten or fifteen feet above Knudsen's head."

There is a statement that all were expected to take down loose rock, but on the evidence above quoted there arises a fair question for the jury whether the corporation master did not assume to take charge of the safety of the place and attempt to exercise this duty through McBride. To my mind

the foregoing evidence is sufficient to support a verdict that the proprietor of the quarry charged McBride, the foreman, with the duty of making and keeping a safe place. On sufficient evidence the jury found McBride negligent. This was a duty of the master which he might intrust to the foreman in charge. But in the exercise of that duty the foreman was a vice-principal, and not a fellow-servant with Knudsen. I think this principle runs through all the cases. It is cited in *Baumann v. C. Reiss C. Co.* 118 Wis. 330, 335, 95 N. W. 139, as follows:

"The evidence is all one way that Roth had full charge of the work upon the dock, that defendant left to him the duty of providing a safe working place for the men, and that he was not personally engaged with them in removing the coal. That made him in every sense a vice-principal in respect to the safety of the trestle, and all other matters affecting the character of the working place in which he placed respondent and his associates."

If he was the foreman in charge and had this duty put upon him by the proprietor or master in addition to the duty of directing the work and sole control of the operation, it would make no difference that he occasionally or intermittently helped in some other part of the work. *McMahon v. Ida M. Co.* 95 Wis. 308, 70 N. W. 478. At a time when it was the settled law of this state that the brakeman and sectionmen on a railroad were fellow-servants it was nevertheless held that where the section foreman had imposed on him the duty to keep the track clear of obstructions at a point where the brakeman was obliged to run along the track in the discharge of his duty, the section foreman was not a fellow-servant with the brakeman so far as regards the duty of making or keeping the place safe. *Hulehan v. G. B., W. & St. P. R. Co.* 68 Wis. 520, 32 N. W. 529. To the same effect are *Schultz v. C., M. & St. P. R. Co.* 48 Wis. 375, 4 N. W. 399; *Hill v. Winston,* 73 Minn. 80, 75 N. W. 1030; *Streicher v. Davenport B. & T. Co.* (Iowa) 124 N. W. 327; *Kaukola*

*v. Oliver I. M. Co.* 159 Mich. 689, 124 N. W. 591; *Horn v. La Crosse Box Co.* 123 Wis. 399, 101 N. W. 935.

To recapitulate: The evidence hereinbefore quoted was sufficient, in my opinion, to warrant the jury in finding that the corporation defendant had through its officers assumed the duty and charged its foreman, McBride, with the duty of making and keeping the place safe. There is no law that I know of against its assuming this duty whether the place of operations be a quarry or a railway. Having, as the evidence shows, assumed and undertaken to discharge that duty through the foreman, it should be liable for its negligent failure to carry out the duty. The decedent with knowledge of such practice might lawfully rely upon the foreman to discharge that duty and thus be misled and lulled into false security. He was negligently killed without fault on his part, as established by the verdict. The plaintiff was therefore entitled to a judgment on the verdict.

I am authorized to say that Mr. Justice SIEBECKER and Mr. Justice KERWIN concur in this dissent.