## LIABILITY FOR INJURY TO A TELEPHONE LINEMAN FROM A FALL.

Common Pleas Court of Franklin County.

THOMAS J. SCHWARTZ v. THE COLUMBUS CITIZENS TELEPHONE COMPANY.

Decided, March, 1914.

*Custom—As to Inspection of Conditions Under Which Work is to be Done—Not Admissible in Evidence, When—Excessive Damages— Duty of the Court Where the Evidence and Charge are Disregarded in Fixing the Amount—Damages Distinguished from Injuries— Compensation Not Restitution.*

1. Where a telephone company has been deprived of the defenses of assumed risk and contributory negligence through its failure to pay into the state insurance fund, and one of its lineman brings an action for injuries caused by the fall of a pole that he had climbed in the course of his employment and which was rotten at the ground, evidence will be excluded as to a custom which cast upon the lineman rather than upon the company the duty ·of inspecting poles with respect to their condition; and in such a case the jury will be instructed that the company is specifically charged with the legal responsibility resulting from its alleged knowledge as to the defective condition of the pole.

2. Failure of the jury to follow the evidence and the instructions of the court touching the damage suffered by plaintiff is ground upon which a trial judge may set the verdict aside; and where a verdict has been returned .of $5,000 for injuries to a telephone lineman from a fall, resulting in nervous shock and his being in a hospital for one week and remaining idle (though perhaps through mistaken advice) for a year and a half, a new trial should be granted unless the plaintiff consents to accept a remittitur .of $2,500.

*Gumble & Gumble,* for plaintiff.
*Daugherty, Todd & Rarey,* contra.

KINKEAD, J.

This case was brought for personal injury resulting from a fall from the top of a telephone pole upon which ·plaintiff had climbed to do some work by direction of the company.   The

pole was decayed or rotten at the ground and the weight of plaintiff caused it to break precipitating him to the ground causing injury. The amount claimed was $10,125, the verdict being for $5,000.

The motion for new trial assigns error in the charge of the court, and excessive damages.

The defendant not having complied with the workmen's compensation act, it was deprived of the common law defenses of assumption of risk and contributory negligence.

Because of what appears to be a custom among telephone and telegraph companies, concerning the obligation or duty of observing and inspecting poles used by such companies before servants thereof shall climb them to make repairs in their lines, an interesting question was presented under the statute which takes away the defense of assumption of risks.

Evidence was offered at trial by defendant tending to show that the custom among such companies, and the regulation of the defendant company, was such that no general inspection was ever made of the poles, but that each workman was to do his own inspection by observing whether the poles were safe before climbing them.

Such a rule would cast a duty upon the servant which primarily rests upon the master. It had the effect of compelling the servant by implied contract to assume the risks incident to the obligation which the terms and conditions of the employment cast upon the servant.

To apply such a rule to the contract of employment in this case, would not only relieve the defendant from all duty and obligation whatsoever, but it would be in direct contravention of the statute which deprives the defendant of the claim of defense of assumption of risk. Hence the evidence as to usage was not permitted and the court in its instructions to the jury specifically charged the defendant with the legal responsibility which resulted from alleged knowledge of the defective condition of the pole and a failure on its part removes the same.

In argument of the motion for new trial it was claimed that the court interpreted too narrowly the terms of the statute,

"wrongful act, neglect or default," as if it was meant to restrict the common law rule of liability.

In respect to such claim it is to be observed that the interpretation of Pugh, J., of the Superior Court of Cincinnati, *Schaefer* v. *C. B. Co.*, 13 N.P.(N.S.), 553, was rejected, and that of *Gerthung* v. *S. T. Co.*, 18 C.C.(N.S.), 496, was followed, although we had not the benefit of the latter decision at trial.

The rule adopted in the charge did not enlarge the basis of the common law rule, but instead enforced such rule of liability. It was specifically stated that "these terms (wrongful act, etc.) mean any failure or neglect to perform a duty required by law of defendant, owing by it to its employees or servants. A wrongful act denotes or embraces all acts which are wrong or in violation of a duty imposed by law which inflicted an injury. Neglect and default mean neglect, omission or failure."

"The wrongful act charged in this case is that the pole from which plaintiff fell broke at the surface of the earth, at which place it was of insufficient strength to hold plaintiff while he was at the top thereof.

"The further charge is that defendant *had knowledge of* the insecure and rotten condition of the pole at the time the plaintiff was ordered to climb the same."

The evidence clearly showed that such knowledge was conveyed to an employee of the company.

The statute, Section 1465-60, makes the defendant liable for any neglect or default of any of the employers, officers, agents or employees. The jury was instructed that:

"It was the duty of the foreman, if knowledge of the defective condition of the pole was made known to him, within a reasonable time to have reported such condition of the pole to the defendant, its officers and agents; and if such report was made to the defendant or any of its officers or agents, it was then the duty of the defendant, within a reasonable time to have removed the pole, and in its place put one that was safe and secure."

The question of fact, with proper instructions, was properly submitted to the jury. And the verdict of the jury is sustained by fact and law.

The serious problem is as to the damages.   Are they excessive?

Courts should be careful to keep within its power in matters of this kind.   A new trial may be granted for "excessive damages, appearing to have been given under the influence of passion or prejudice" (Code, Section 11576), or when "the verdict is not sustained by sufficient evidence."

This injury occurred June 5, 1912.   The action was filed November 7, 1912.   Verdict was rendered February 12, 1914.

Plaintiff was in the hospital one week.   He returned to the hospital for an examination six months after that.   Such an injury, Dr. Brock states, would cause "more or less nervous shock"; that until the person would overcome such shock, he would have trouble in sleeping.   Such injury, he says, would not necessarily result in pain in the back of the head, although it might.   He states that, though it is possible, a resulting nervous shock from a fall would not ordinarily last so long as a year and a half after the fall.   Absolute quietness, he says, is the cure for the trouble.

Dr. Brock describes the injury as a sprain in the back as stated to him by the patient, stating "his main injury we *felt* was in the sacro-iliac joint; that is the joint where the backbone and the pelvic bones join, what is called the sacro-iliac joint; that is, a sprain of that joint, and also of some of the lumbar muscles in the back, but no fractures of any kind that we could find."

Dr. Brock stated that with quiet and rest, and some support to the back in some way either by strapping or some sort of a jacket to the back, the party would have a positive cure from an injury like this; that it would ordinarily take several weeks for a cure.

Dr. Lippett states that plaintiff consulted him about March 15th to 20th, 1913; that he complained of considerable pain and nervousness; that on examination he was tender to the touch in the region of the spine on the left.   This doctor said "from his symptoms, and the way he walked, and the nervousness, I thought that the nervous system was shocked, possibly the spine was injured."   He expresses the opinion that he did "not believe that he will ever be the man he was before the accident.

He was a big strong man." Dr. Lippett wrote a letter to an officer of the company August 31, 1912, in which he stated that there was no visible sign of injury, swelling or inflammation, but he complains of severe pain in low portion of spinal cord, great nervousness, and insomnia, but that he was improving and will ultimately recover.

Dr. Howell who made an examination of plaintiff during trial testified that he made an examination of his spinal column to see if there was any abnormal curves in it; there were none; the tension of the muscles on both sides of the column were the same; he complained of no pain until the point, the sacro-iliac articulation, was reached, that is where the spinal column joins the pelvis; at that point he complained of pain.

Dr. Howell then made an examination of plaintiff, with a view to the condition of his nervous system.

"The head and face—we made him move the different muscles of his face, tongue and muscles of expression, to ascertain if the cranial nerves, that is, the nerves originating in the brain, if they were functioning normally. They were. One side of the face would pucker up; he could use one side of the face just as well as the other, so that both cranial nerves, the right and left * * * were functioning normally. Putting out his tongue, came out promptly, straight, not to one side or the other, and there wasn't any tremor to the tongue. * * * There are indications that the cranial nerves were in normal condition. The upper extremities were then examined, as flexion, extension, and prehension, * * * that is the grasp that one has in his hands, as in shaking hands or lifting something, normally. The thorax or chest was examined as to the condition of his heart and lungs, and were both normal. The next was the abdomen; that was examined to see if there was any abnormal enlargement of the liver, displacement of the kidneys. * * * The liver as of normal size, kidneys in normal position; the intestinal tract was soft; the abdominal wall was soft, showing that everything within was in a normal state. * * * I then examined his lower extremities, * * * from the hips down. All the functions of the lower extremities were carried on in a normal manner. The spinal column was examined, * * * the normal curves were present. There was no pain in the back save and except at the point * * * of the sacro-iliac articulation. * * * In order to test the flexibil-

ity of the spine, * * * to see if it was flexible, * * * and could be moved in different manners, I placed a pocket knife on the floor and asked him to stoop over and pick it up, which he did. So that the elasticity and flexibility of the spinal column are in normal condition. * * * In diseases of the spinal cord or in organic conditions of the spinal column, the patient does not bend forward in picking up a knife, for instance, * * * he wont flex the back at all, he just bends his knees to get it.

"Nervous system: The patellar reflex was normal. By patellar reflex we mean that, with the patient's limb crossed, * * * if you hit the knee right below the kneecap you have that motion (that is kicking); you can not help it; in a normal person, that is always present; * * * because a reflex takes place. That was normal in this case. In diseases of the spine, that patellar reflex is lost. Ankle clonus was absent, which is normal. * * * (Explanations omitted.) I then tested the different paths that led from the extremities of the brain, the different spinal paths. There is a path for heat and cold (omitting explanations) showing that the paths of conduction between the extremities and the head were in a normal condition. Tactile touch was normal. * * * If you take a feather or a fine piece of paper, and scratch over the part, if the patient feels that, it is known as tactile touch, or if you feel something in your hand, they can sell the shape of it; that is tactile touch. * * * Cornig's sign was absent, which is normal. In diseases of the spine, Cornig's sign is present.".

Dr. Howell thereupon expressed the opinion that if there had been some sprain or wrenching of the cartilages connecting the sacro-iliac articulation, plaintiff had recovered from it.

Besides the testimony of the physicians we have that of the plaintiff himself, whose complaint since the time of leaving the hospital is that he has had pain, that he has spent sleepless nights, and that he is nervous. The claim is that he suffered injury to "his spine and other internal injuries," that his "physical and nervous condition" is impaired to such an extent that he has been unable to work. And he has not worked for a year and eight months and more.

Then what does the evidence show his probable damage to be?

A breach of duty and *damages* are the essential elements of a right to or cause for action for negligence.

*Damage* is a technical term distinguishable from *injury,* which is the gist of a right of action. While violation of duty, or the wrongful acts showing violation, is an essential of a cause of action the loss, detriment, harm to the person constituting damage to the person is equally an essential element of a cause of action for negligence. To constitute damage in personal injury there must be an *impact* resulting in loss, detriment to the person, causing physical suffering, sickness, pain, loss of time and power to work.

Ordinary damages are a sum awarded as a fair measure of compensation to the plaintiff, the amount being, as near as can be estimated, that by which he is the worse for the defendant's wrongdoing. Compensation, not restitution, is the proper test. It is not possible to lay down a universal rule for ascertaining the amount, the causes and circumstances of actionable damage being infinitely various. Money can never actually compensate one for personal injury accurately. The most the law aims to do is to give some just compensation for the damages suffered.

In the assessment of the damage there should not be any speculation, or "passion or prejudice."

The jury must follow the rule of law or the measure of damages given it in the charge of the court, and the evidence. The court instructed the jury to award plaintiff such damages by way of compensation for the injury by him sustained, including pain, if any; and for time actually lost on account of the injury. The jury was instructed to "be governed by the evidence and determine therefrom the nature and extent of the injury claimed. "You should not speculate or act upon conjecture not based upon the evidence."

The jury evidently did not follow the evidence nor the instructions of the court in the assessment of damages. And it becomes the duty of the court now to carefully consider the question of damages with a view to doing as nearly exact justice to both parties as may reasonably be done.

It has seemed that courts have not always been specially attentive to the duty in the matter of the amount of damages allowed in this class of cases. It is an important duty and is to

be carefully and cautiously performed. The court must be careful not to be partial to either the defendant nor the one who has suffered the injury. The law of compensation must be just and impartial. If the jury makes a mistake, the court must endeavor to correct it.

The amount of recovery in cases like this is often the dominant thing, yet more frequently receives the least attention. of counsel and the courts. It has been suggested by a recent opinion that the discredit of the system of the administration of justice in matters of this nature has been ''in failure to impress upon juries the true logic of recoverable loss, and giving too much heed to unbridled arbitrary awards under lingering influence of the perversion that the court is practically helpless where the award is not characterized by passion or prejudice.'' *Buck* v. *Bremery Co.*, 148 Wis., 222; 134 N. W., 914; Ann. Cas., 1913 A. 1357, Marshall, J., dissenting.

When a court explores the evidence in the case to determine whether the verdict ''appears to have been given under the influence of passion or prejudice,'' it is often like soaring in the field of metaphysics. But if we seek to determine whether the verdict for the amount awarded is excessive because it is not sustained by sufficient evidence we tread on safer ground.

The opinion in the above cited case by Marshall, J., recites some interesting considerations which he is of opinion should enter into the matter of assessment of damages. While we may not coincide with all he states, still his observations are of such interest that the same are here reproduced:

''In view of my oft expressed opinion respecting the ethical right of every employee to just compensation for inadvertent bodily injuries received in the course of his employment, regardless of the source of fault, it can not be thought I am keenly sensible to human suffering in such cases. But one must hold to legal, just practical standards. * * *

''I repeat what I have urged before, personal injury losses in service, necessarily, must enter into the cost of production to be paid, ultimately by the consumer, according to an economic law as certain in its operation as in nature, there is no escape from it. Invisible and unappreciable as it is, as much as the

forces which control the planets, the ultimate point of rest of all such losses is the body of the products entering consumption. Humanity as well as conservation of human resources and welfare, require this truth to be appreciated, as I have taken the liberty, several times, of suggesting. *Monaghan* v. *Fuel Co.*, 140 Wis., 457; *Hong* v. *Lumber Co.*, 144 Wis., 337; *Knudsen* v. *Stone Co.*, 145 Wis., 394 (33 L. R. A. [N.S.], 223).

"However, the idea of compensation, whether vitalized by common law rule or written law or left to rest in mere ethical standards, springs from one's sense of justice under all the circumstances, keeping in mind that full compensation is impossible, the attempt to effect it destructive, and that those who furnish opportunity for employment as well as the employed are to be considered in dealing with the matters which are the inevitable incidents of industry, the common misfortune and common burden. True logic in the field under discussion is stated in *Guinard* v. *Knapp-Stout & Co.*, 95 Wis., 482, and often approved here:

"'Although the defendant may have committed a fault, it is not, for that reason, an outlaw nor beyond the care of the law. Society may still receive valuable service from it, and so is interested to preserve it against spoliation, by applying to plaintiff's recovery a proper limit of compensation. It could not advance the interests of society to impoverish and bankrupt the unfortunate defendant. * * * Absolute indemnity is impossible. The most (the law) aims to do * * * is to give some just compensation for the damages suffered.'

"To go further in an effort to repair a personal injury loss than as above indicated, would establish a new rule, productive of waste, which legislatures * * * have been striving to prevent. Exorbitant recoveries encourage litigation, demoralize the profession, discourage industry, prejudice general welfare, and bring down criticism upon the courts as inefficient to maintain a practicable standard of justice. Just compensation to the injured is a legitimate part of created things; and excess with its large public and private incidental expense, constitutes waste, abnormally increasing the price of consumable things, decreasing industrial activity and opportunity for labor, bearing down wages and up the cost of worthwhile existence. From any viewpoint, courts should co-operate with the law making power to make recoveries certain and economical, where there is a right to recover, but always within reasonable limits."

Giving attention to the evidence in this case for the purpose of showing that the verdict is not sustained by sufficient evidence, it

is clear from plaintiff's own witnesses, especially the doctors, that the injury consisted of a severe impact by the fall, which, according to Dr. Brock, would by rest and quiet mend in "several weeks."

Aside from the substantial testimony as to the fall and of the doctors, is the complaints of the plaintiff himself, which are to be construed as an injury to his nervous system. There is also the expression of pain when he was examined by Dr. Howell.

It seems entirely clear that there could not have been a serious injury to the nervous system of plaintiff from the shock resulting from the fall which could not have been cured by "several weeks" rest. At the time of the examination by Dr. Howell plaintiff's condition was normal. Exercise is the most valuable aid to a shock to the nervous system either to the brain worker or to the manual worker. It will keep the system in order. Whatever tends to produce a healthy body also tends to maintain a good condition in the nervous system. For one, who had been as active as plaintiff prior to his injury, to absolutely cease his active efforts, and to give himself up to the idea that he must not exercise by performing any kind of labor, seems the worst thing that could have happened to him. Nerve cells consume food by continued activity, as they also do by rest. But there is a marked distinction between a nervous shock to one like plaintiff whose active life had been climbing telephone poles, and a brain worker of sedantary habits. If the nervous system of the latter is shocked by over and continuous mental exertion, rest and continuous rest may be the best restorer. But in the shock such as plaintiff experienced after "several weeks" quiet and rest, as Dr. Brock states, he should be recovered from his nervous shock, after which he should not continue to neglect his muscular activity, dwelling upon his past injury and his right of action against the one legally responsible therefor.

Plaintiff should not have lost more than two or three months, after which he was able and should have gone at some kind of work. He would have been better off. The testimony of his own witnesses and of Dr. Howell shows this.

While the amount of the damages is for the jury, if the amount awardable is not in accord with the evidence, a motion for new

trial because the verdict is not sustained by sufficient evidence should be sustained, which is accordingly done.

In *Pilling* v. *Benson* (R. I.), 84 Atl., 1005, man thrown from wagon in collision with automobile, the verdict was $4,000. Well within few months; verdict reduced to $1,000.

In *Walsh* v. *Peoria R. Co.*, 15 Ill. App., 453, chauffeur injured in collision with street car; loss of time five months; verdict $2,225.  Reduced to $1,625.

*Watkins* v. *Chicago*, 146 Ill. App., 552, young woman fell on sidewalk; injury to back, ankle and leg producing serious shock and impairment of health.  Sustained.  Verdict was for $...., reduced to $.....

In *Pfeiffer* v. *Radke*, 144 Wis., 430, woman thrown from buggy in runaway; also personal injury to back; verdict for $1,500; reduced to $800.

In *O'Flanagan* v. *R. R. Co.*, 145 Mo. App., 276, switchman had bad fall, broken ribs, bruises and sprains; principal affliction traumatic neurasthania.  Verdict of $5,000, reduced to $3,000.

In *Redden* v. *R. R. Co.*, 79 N. J. L., 3, woman fell in alighting from street car.  Verdict of $3,500, reduced to $2,500.

In *Blado* v. *Draper*, 89 Neb., 787, woman; collision between carriage and automobile, injury not stated; verdict for $3,000, reduced to $2,000.  Cases found in note Ann. Cas. 1912 A., p. 1361.

Though it seems that plaintiff was not justified in remaining idle as long as he did, still he did so because he received this injury, and lost his earning during this period, though perhaps largely on account of mistaken suppositions concerning his condition.

If plaintiff will consent to a remittitur of $2,500 the motion for new trial will be overruled; otherwise it will be sustained.